## UNITED STATES v. McSHANE et al.
### No. 967.

Circuit Court of Appeals, Tenth Circuit.
May 9, 1934.

992

Daniel Dillon, Atty., Dept. of Justice (Thomas J. Morrissey, U. S. Atty., and Richard A. Toomey, Atty., Dept. of Justice, both of Denver, Colo., and W. B. Snow, Atty., Dept. of Justice, of Charlotte, N. C., on the brief), for the United States.

Sherman A. Sutliff, of Denver, Colo. (Frank E. Gove and Kenaz Huffman, both of Denver, Colo., on the brief), for appellees.

Before LEWIS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge.

This is a suit on $10,000 war risk insurance policy issued to William P. McShane, brought by his administrator and his mother, the latter named as beneficiary in the policy. He was received and enrolled August 2, 1918, as a soldier on his application. At that time his age was eighteen years and one month. His occupation at that time was high school student. His complexion was ruddy, his height five feet nine inches. He had had no illness or disease since childhood except tonsilitis and rheumatism. On December 26, 1918, while he was in the military service, he entered Hospital 104 in France. He complained of cough and pain in the chest. On January 20, 1919, he entered Base Hospital No. 106. The record there states that his cough began in December, 1918; that he had never spit blood; that there was no family history of pulmonary tuberculosis. His sputum was positive. The diagnosis was tuberculosis, chronic, active of the upper right lobe, and evacuation to the states was recommended. On return to this country he appears to have been in hospital at Staten Island, New York, for a short time from which he was transferred to U. S. A. General Hospital No. 21 at Denver, Colorado, and was honorably discharged from the army there on August 5, 1919. His physical condition then was poor.

While in Hospital No. 21 he was given a short furlough. He went to see his mother at Grand Island, Nebraska, in May, 1919. She testified that he remained with her for ten days or two weeks; that he had a bad cough, night sweats, not much appetite; that she saw him again a day or so before Christmas until New Year's, and that his physical condition and appearance was then worse; that he had fever in the afternoons and a bad cough, and when he left he went back to Boulder to school; that she next saw him when she went to Boulder April 8, 1920, and lived with him there until 1926; that he went back to Hospital No. 21 in February, 1922, and remained there until May or June; that he attended the university at Boulder; that his appetite was not good; that at times he missed his classes on account of his physical condition. He made his home with her in Boulder between 1922, when he returned from Hospital No. 21, and 1926, and in those years he was back and forth from Denver, and she saw him every week or two. In 1925 and the years following he was in Texas, New Mexico and Arizona on different trips, but between 1922 and 1926 he was in Colorado the greater part of the time. He died at Salt Lake City, Utah, on May 18, 1927. The death certificate contains this as the cause of death: "Pulmonary Tuberculosis (duration) 6 yrs. Contributory (Secondary) Myocarditis, Chronic (duration) 2 yrs."

Several other lay witnesses corroborated his mother in her description of his physical appearance, cough and lack of physical strength. Some of them saw him early in 1919 at Hospital No. 21. One of them was then a patient there and accompanied McShane on a trip of four or five months to New Mexico in 1922. He testified that McShane was selling books. He couldn't say for how long a time, but McShane would go out and then would come back, three or four months at a time, but didn't make much success. Others saw him at later dates, and some of them not until he went to Boulder as a student in the latter part of 1919. One of them who was a classmate there testified that while there as a student McShane worked as a salesman, and he thought he was a very good salesman. Others did not meet him at Boulder until 1920. All of them however give much the same description of his physical condition. He had a bad cough, poor appetite, was short of breath, and not much physical energy.

Dr. Troute testified as a specialist for the plaintiffs. He was in the employ of the Veterans' Bureau at Denver from May 11, 1920, to June 1, 1930, and while so employed examined McShane on June 14, 1922. His diagnosis at that time was tuberculosis, pulmonary, chronic, moderately advanced, ac-

tive; pleurisy, chronic, fibrous. He gave it as his opinion that McShane was on March 1, 1919, totally and permanently disabled to such an extent that it was thereafter impossible for him to follow continuously any substantially gainful occupation, and that it was reasonably certain that such condition would continue throughout his life. He gave at length his reasons for his opinion so expressed. It was based not only on his own examination but on the record of examinations made by other physicians at Hospital No. 21, some of which were made early in April, 1919, and on the fact that the death certificate reported that McShane died of tuberculosis in 1927. In fact, on cross examination he testified that it was his opinion that McShane was permanently and totally disabled from January of 1919, "when they caught a positive sputum on him at Bordeaux, France." He added: "I do not contend that this young man or any other young man is permanently and totally disabled from and after the date you catch a positive sputum." He had no personal recollection of McShane. He was further asked on cross examination to put himself in the place of examining doctors in Hospital No. 21, who had McShane's Bordeaux history in front of them and who had McShane under their care from March, 1919, until he was discharged in August, 1919, and say whether he would have been willing to state at that time that McShane's tuberculosis would be fatal. His answer was that no living man could have made that kind of statement; that the three doctors who examined him during that time were competent men; that he would probably have done exactly as they did; that—

"Accepting Dr. James' findings, which we can honestly, of July, 1919, the x-ray and all, had that man (McShane) gone to bed and been kept in bed perhaps for eighteen months to two years, it would probably have arrested his condition. * * *

"The fact that Dr. Printz in 1919, and Dr. Dodge in 1919, 1920 and 1921, upon repeated examinations found McShane's tuberculosis to be arrested does not cause me to modify my opinion. I do not believe an arrested case of tuberculosis is a permanent and total disability during the period of arrest, if you have an arrest.

"Q. If physicians find an arrested condition over a period of two to three years, would you be willing to accept that?

"A. It depends upon who found it.

"Q. Then, Dr. Troute, placing yourself back in March of 1919, and having the same

history and the findings that Fitzsimons had and made, you would say as of that time that if this boy took proper care of himself and followed a reputable physician's advice he had an opportunity for arresting his condition, wouldn't you?

"A. I would say that, yes sir. * * *

"Q. So then, Dr. Troute, placing yourself back at the time in question, along in March of 1919, and placing yourself then as the examining physician, you would have been willing to say that 'Mr. McShane, if you follow proper care and treatment you have got an opportunity for becoming an arrested case of tuberculosis.'

"A. Right, sir.

"Q. There was nothing at that time which would permit you or any other physician to have told that boy with any degree of reasonable certainty that he would never get well, was there, Doctor?

"A. That is right. * * *

"Q. Even had this boy's condition become arrested would that in itself have indicated that he was able to carry on continuously a substantially gainful occupation.

"A. From the tuberculosis standpoint, an arrest ordinarily means ability to carry on. It is one of the things by which you judge arrest. * * *

"In making my decision as to the date of this permanent total I used the subsequent events as I did the ones immediately following. No one could have said in 1919 what we have said today. We are compelled to use the subsequent findings and event in the case to be able to tell you what was happening in 1919. * * *

"Q. You don't mean to say, Dr. Troute, that these doctors at Fitzsimons who had this patient in front of them day after day for months, who knew his condition from morning to night, and, through the charts, during the night—that they did not know more about this boy's health at that time than you do right now?

"A. No.

"Q. You don't mean to say that, do you?

"A. No, we have got the death certificate.

"Q. That is really what you are relying on a whole lot?

"A. The subsequent events must enter. I would have done the same thing in 1919 that those men did.

"Q. In other words, Dr. Troute, back in 1919 there wasn't a reasonable certainty that

this boy would not become an arrested case, was there?

"A. At that time that is very true."

Defendant called Dr. James, to whom Dr. Troute had referred to in his testimony, as its witness. He had specialized in tuberculosis and diseases of the chest since 1914. At the time he testified he was in charge of the Veterans' Bureau Hospital at Tucson, Arizona, as its medical officer. He had been in charge of such hospitals for ten years. He was in General Hospital No. 21 at Denver from December, 1918, to March 11, 1920, and treated tuberculosis patients there. He examined McShane while he was a patient on April 25, 1919, and was shown the chart of his examination. McShane was in his ward from April 22, 1919, to June 5, 1919, except for a few days' furlough and was under Dr. James' observation daily. He described the first examination he made from which his diagnosis was tuberculosis, pulmonary, chronic, inactive. Prognosis good. He said that McShane was eligible for school training, and that he would not have considered him eligible if his tuberculosis had been active. It was his opinion that he was not totally and permanently disabled while he was under the care of the witness from April 22, 1919, to June 5, 1919, according to the accepted definition, that is, that he had no impairment of body or mind which rendered it impossible for him to follow continuously any substantially gainful occupation; that he did not have any symptoms of clinical tuberculosis, and it was thought he was able to enter national training; that he would be better off working than loafing at that time. On cross examination he was asked whether pulmonary tuberculosis might be active and not present any symptoms of activity. He answered: "I believe during the period of observation that if this man had any active tuberculosis it would have been found to be present." He testified that he had not examined McShane after the summer of 1919. He did not believe him to be cured but to have tuberculosis in an arrested state which permitted him to be sent to school, and that his disability then did not prevent him from carrying on a gainful occupation.

Dr. Printz had died prior to the trial, but the record of two examinations he made of McShane, one in August and one in September, 1919, were admitted in evidence. The one on August 6 showed: "No cough, no night sweats, no hemoptysis, appetite good, sleeps well, bowels regular. Supra clavicular depressions. Impaired resonance over right apex. Breath sounds over right upper lobe roughened and interrupted with changes in whispered voice sounds. Dry rales over right upper lobe. Fibrosis in rt. upper lobe over left upper lobe post. and intrascapular region vesicular rales. Extent of present disability: 25%. Is he able to perform any part of former or any other occupation? Yes, 75% * * * What are chances for recovery? Good for arrest. Is his condition yielding to treatment? Receiving none. * * * Pulse 88, Temp. 98.2, Weight 135 lbs." His examination on September 24, 1919, in part reports: Slight cough, chronic pulmonary tuberculosis quiescent. Prognosis good. Able to resume former occupation. Advise vocational training. Do not advise hospital care. These charts were used as evidence.

McShane was then sent to Boulder to complete there in the preparatory school his high school course, which had been interrupted when he was enlisted. Dr. Dodge, who was and had been theretofore employed as United States Assistant Surgeon, was stationed there, and he examined McShane on six different occasions at that place while he was pursuing his course of studies, first while he was finishing his preparatory course and thereafter a course in engineering. These examinations were on October 30, 1919, December 2, 1919, February 25, 1920, April 29, 1920, May 20, 1920, and June 17, 1921. He made reports of these examinations and had copies of them in hand while he testified. His first examination showed that McShane's physical condition was then good; that he had as a disability chronic pulmonary tuberculosis in a stage considered quiescent with an involvement in the upper lobe of the right lung; and that prognosis was good for continued quiescence or progress to arrest. On the second examination McShane's temperature, pulse and respiration were normal. His weight had increased over previous examination. His tuberculosis was arrested, and prognosis for its continued arrest was good. The third examination gave substantially the same findings with continued arrest and good prognosis. His fourth examination resulted in the same findings and the same good prognosis. The fifth examination showed a continuance of the physical findings and general condition good. His pulmonary tuberculosis was definitely arrested. Prognosis good. The sixth and last examination was made when McShane proposed a summer vacation. His temperature and pulse and respiration were within normal limits, his weight somewhat less than previous report,

his general condition good, his pulmonary condition considered definitely arrested, and prognosis good. He testified that the several examinations did not indicate any particular change during the period that McShane was under his medical observation. "His physical condition was good at all times." He had a personal recollection of McShane while he was a student at the preparatory school and in the university during the time covered by his examination. He gave it as his opinion that McShane was not permanently and totally disabled within the accepted definition, which was read to him, during the period he was under his observation, "because his physical condition was such that he was able satisfactorily to carry out the work as a student assigned to him by the Federal Board of Vocational Education." On cross examination he testified that at the time of his examinations McShane's condition was not such that any disabilities which he had were apt to become worse at any time; that he could then follow any ordinary occupation or occupations for which he was qualified which did not involve strenuous mental application, physical fatigue or undue severe climatic exposure; that continuous employment during the times he examined McShane would not have been detrimental to his health; that he saw no reason, with his tubercular processes continuing under arrest, why he would not be able to carry on satisfactorily for an indefinite period; that his condition was one of definite arrest during that period; that it would have been possible for his tubercular condition to reactivate in 1922, but reactivation would have no bearing upon his previous period of arrest; that it would have been possible for McShane to have had active pulmonary tuberculosis at the time of his examination, but it was not probable because McShane would not have been able to continue satisfactorily as a student with an active tubercular process going on; that McShane did not have a serious disability at the time of his examination, he had a minor disability because of the limited involvement and the fact that the tubercular process was definitely arrested; that the government offered vocational training to honorably discharged ex-service men who had a disease or disability connected with their military service in a degree of ten per cent or more, but this disability had to be less than total and permanent, and vocational training was restricted in tubercular cases 'in that no vocational training was allowed to any veteran who had active tuberculosis.

At the close of all the testimony the defendant below moved for a directed verdict which was denied, and it was urged upon us here that the court erred to the prejudice of defendant in denying that motion.

Counsel seem to agree that the crucial date was March 24, 1919. The policy lapsed unless McShane was then totally and permanently disabled: "Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed to be total disability. Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

It was the opinion of Dr. James, who had McShane under his personal care from April 22, 1919, to June 5, 1919, and who examined him several times, that McShane was not during that time totally and permanently disabled, nor to such an extent as would prevent him from carrying on a gainful occupation. That was also the opinion of Dr. Dodge during the time he made observations and examinations of McShane while he was pursuing his studies at Colorado University from October 30, 1919, to June 17, 1921. Dr. Dodge examined McShane on six different occasions during that time. Each of these doctors in his diagnosis reported that McShane's tuberculosis was arrested, prognosis good; that his physical condition was good at all times; and they saw no reason, with his tubercular processes continuing under arrest, why he would not be able to carry on satisfactorily for an indefinite period of time; that there was a definite arrest of his tubercular condition during those periods. Dr. Printz's reports of his examinations have been stated above.

Dr. Troute, the only expert witness for plaintiff, first saw McShane, so far as the record discloses, on June 14, 1922, and he examined him that day, approximately one year after the last examination by Dr. Dodge. Dr. Troute's diagnosis at that time was that McShane had "tuberculosis, pulmonary, chronic, moderately advanced, active; pleurisy, chronic, fibrous"; and he gave it as his opinion that McShane on March 1, 1919, was totally and permanently disabled. He afterwards said on direct examination that it would be even fairer to date his permanent and total disability back to his first positive sputum on January 20, 1919, at Base Hospital 106 in Bordeaux, France, but on cross examination he said: "I do not contend that

this young man or any other young man is permanently and totally disabled from and after the date you catch a positive sputum. * * * My opinion as to permanent and total disability was not based on positive sputums alone." He was shown copies of the examination reports and diagnoses made by Dr. James, Dr. Dodge and Dr. Printz and was told that they would testify. He stated that they were competent and reliable. He said further: "I do not believe an arrested case of tuberculosis is a permanent and total disability during the period of arrest. * * * " He based his opinion on his own examination June 14, 1922, the death certificate which stated that McShane died of tuberculosis on May 18, 1927, and the testimony of lay witnesses. Thus it seems to have been clearly proven by defendant that from the time McShane entered the hospital at Denver in March, 1919, up to and until the last examination by Dr. Dodge on June 17, 1921, his tuberculosis was an arrested case; that it would probably remain so; and that during that time he was not totally and permanently disabled. Dr. Troute testified that an arrested case was not in his opinion permanent and total disability. The four doctors named were the only experts in the case. Clearly such witnesses are the only ones who can give information on the inquiry whether a given case of tuberculosis is incipient or has been arrested. Scharlach v. Pacific Mut. Life Ins. Co. (C. C. A.) 16 F.(2d) 245. It follows that all of the competent and reliable proof on that subject was with the defendant. From the testimony of Dr. Troute it became active again not later than June, 1922, more than three years after March 24, 1919. There is testimony that McShane went back to Fitzsimons Hospital in February, 1922, and remained there until May or June of that year. His mother testified that he went back because he was bad off and could not go to school any longer, but there is no testimony as to whether an examination was made at that time or as to what treatment, if any, he then received. In Nicolay v. United States, 51 F.(2d) 170, 172, we had occasion to say in a case like this:

"The plaintiff's right to recover depends upon whether or not he was permanently and totally disabled in May, 1919; the fact that he was then in the early stages of tuberculosis is not conclusive, for we are not required to close our eyes to a fact known to most mankind, and that is that many men and women are now doing their daily tasks who have at one time been so afflicted."

Again in United States v. Rentfrow, 60 F.(2d) 488, 489, we said:

"But the burden of proof is upon the plaintiff to prove that the disability was permanent, that is, 'founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it.' This burden is not carried by leaving the matter in the realm of speculation. The proof in this case is that his disability in 1919 was not permanent; * * * it is a matter of common knowledge, as this court took occasion to say in Nicolay v. United States, supra, that many incipient tuberculars respond readily to the simple treatment of rest and nourishment, and are thereafter able to follow many gainful occupations.

"Such cases as these, which are as frequent as they are unfortunate, make a strong appeal to the sympathies. An incipient tubercular stands at a crossroads: If he continues his ordinary activities, his condition is a hopeless one. On the other hand, if he will follow a program of complete rest and wholesome nourishment for an indicated period, the chances are strongly in favor of an arrested condition and a substantial cure."

In United States v. Thomas, 64 F.(2d) 245, 246, we said:

"It has been held, by this and other courts, that the plaintiff must establish, by substantial proof, that the insured was totally and permanently disabled while the policy was in force; that proof of minimal or incipient tuberculosis during that period, without more, is not sufficient to carry the case to the jury."

In United States v. Harrell, 66 F.(2d) 231, 233, we said:

"It has been held by this and other courts that the plaintiff must establish, by substantial proof, that the insured was totally and permanently disabled while the policy was in force, and that proof of minimal or incipient tuberculosis during that period, without more, is not sufficient. (Cases cited.) It is evident that Harrell was suffering from minimal or incipient tuberculosis at the time of his discharge from the army and before his policy had lapsed, but there is no evidence that this condition could not have been arrested with proper care and rest."

See, also, Eggen v. United States (C. C. A.) 58 F.(2d) 616; United States v. Clapp (C. C. A.) 63 F.(2d) 793; United States v. Lumbra (C. C. A.) 63 F.(2d) 796, which was affirmed by the United States Supreme Court

in 290 U. S. 551, 54 S. Ct. 272, 276, 78 L. Ed. 492. Falbo v. United States (C. C. A.) 64 F.(2d) 948; United States v. Hairston (C. C. A.) 55 F.(2d) 825.

It is to be observed also that eight years elapsed between McShane's discharge in 1919 and his death in 1927. Presumptively he did not believe himself to be totally and permanently disabled in March, 1919, else he would have sued on the policy. No such claim was made by him of the Veterans' Bureau or its Director. The Supreme Court in the Lumbra Case said:

"And in the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed."

The court instructed the jury: "There is only one issue in this case, and that is: Was this boy totally and permanently disabled in March, 1919?" The burden was on the plaintiffs to establish an affirmative answer. They failed. The court erred in refusing to direct a verdict for appellant.

Reversed and remanded.