## UNITED STATES v. SCHROEDER.

### No. 5337.

Circuit Court of Appeals, Seventh Circuit.
April 30, 1935.

James R. Fleming, U. S. Atty., of Fort Wayne, Ind., Luther M. Swygert, Asst. U. S. Atty., of South Bend, Ind., and Will G. Beardslee, Director, Bureau of War Risk Litigation, and Young M. Smith, Atty., Department of Justice, both of Washington, D. C., for the United States.

Lewis J. Murphy and Floyd O. Jellison, both of South Bend, Ind., for appellee.

Before EVANS, SPARKS, and FITZHENRY, Circuit Judges.

FITZHENRY, Circuit Judge.

This is an action on a war risk insurance policy. At the close of all the evidence, the government requested the court to direct a verdict in its favor on the ground that the evidence failed to disclose total and permanent disability while the policy was in force. The request was denied and the cause submitted to the jury which returned a verdict in favor of plaintiff, appellee here. Appellant relies upon one assignment of error, viz., that the trial court erred in overruling its motion for a directed verdict at the close of all the evidence since there was no substantial evidence that appellee became permanently and totally disabled on January 29, 1919, or at any time prior to the lapse of the insurance contract on May 31, 1919, by reason of appellee's failure to continue the payment of premiums due thereon.

All of the evidence in the record is to the effect that insured was an active, healthy, young man when he entered the service. He had been employed by a bicycle manufacturing company at LaPorte, Ind., for thirteen years as a wheel truer and had become expert in that work. In September or October of 1918 the soldier was on his way to Mont Pons, France, marching, when he became very ill. What occurred is best described in the soldier's own words:

"We did not have warm meals on this hike, bread and bacon mostly. At noon, we had a little slumgullion. We had to sleep wherever we could find room, if there was some buildings that wasn't used, that had brick floors. It was always raining. We had to sleep on bricks or any place we could find. It was cold and kind of rainy. I was always wet. We came across a creek when we was marching. The captain ordered every one to take a bath in that creek. And I, (and there was several others) wanted to be excused from taking this bath. He ordered any one not going in to be thrown in. So I just took my bath. I had to go in. The water was ice cold; in places it was clear. Where I went in it was clear and cold.

"I just had a lot of pains in my chest and in my heart beating too. And I had a fever. I could feel it. I was very weak. A towel was not a part of a soldiers equipment. There was nothing to dry myself on after I came out of the water; had to put my clothes on the way we was. I can't remember if there was any marching done after I took this bath. That night I stayed in a billet with a brick floor in. It was not far from where I went in swimming. I would judge about a mile. That was close to Mont Pons. We were close to it, but it seemed as if they didn't want us in there yet.

"I got sick then. The next day we went to Mont Pons, France. It was only about a mile away, I guess. We went into empty

houses. We got in there one day and the next morning I turned in for sick call.

"They had a place for doctors there, just an examining place; that wasn't just at Mont Pons but just a little bit out of it, sort of an infirmary. A regular army doctor took my fever and felt my pulse. I had 104 fever and he told me I was a very sick man. That was the next day after I arrived at Mont Pons. He told me to go to a certain point on the field there. And he said, 'You go and lay down there, and there will be an ambulance get you.' That was right out in the open field. He said he would send me to a hospital. I went out in the field. I believe there was 4 or 5 others there, something like that. I was lying right out in the open. It was right after dinner, noontime. He didn't say when the ambulance would pick me up. I layed there a whole day and a night. The next day the ambulance came. I didn't have any warm food, or coffee, or anything like that; not a thing, and no medical attention. I had not been given any medicine at the infirmary, nothing to take at all."

Appellee was taken to a hospital where he remained for five weeks. He testified that one of the doctors told him that he, the doctor, thought appellee had tuberculosis. Another doctor said he had influenza and pneumonia. He was placed in a casualty company and sent to Brest and hence back to the United States. He complained of pain in the chest, weakness, and spitting up blood. Back in the United States he was examined by government doctors many times. He was told that they could do nothing for him. He was receiving no treatment, just examinations and observations. He was then discharged and sent home. He received a surgeon's certificate of disability discharge with a D classification, the lowest grade. This read in part:

"I certify that I have carefully examined the above-named soldier and find him incapable of performing the duties of a soldier because of * * * Valvular heart disease-Mitral Insufficiency, which renders him unfit for the performance of any military duty. Prognosis unfavorable. Board recommends that he be placed in Class 'D' and discharged on Certificate of Disability. Maximum improvement has been obtained." The certificate also stated. that he was 25 per cent. disabled from earning a subsistence in view of his occupation. When it is considered that his occupation consisted of sitting in a comfortable position and using a wrench, and involved only fast fingers and closs attention to detail and no real labor, it is indicated that he was far from a well individual at the time of his discharge.

A friend who had chanced to see appellee while in the hospital in France testified that, "He looked awful. His eyes were sunk in, and then there was a double ring and they was still sunk in more. He looked like a skeleton. I could hardly look at him." Another friend who returned to LaPorte with him on the train at the time of his discharge testified that he was thin, pale, and yellow-eyed and weak. His friends, his family, and his fellow workers at the bicycle factory where he returned to work and worked with reasonable regularity for about six months and then irregularly for the remainder of the year testified to the same effect. Appellee and his family testified that from the time of his return he coughed, spit up blood, had night sweats and pain in his chest and heart, and felt feverish. He was told that he had tuberculosis by Dr. Ross in October or November, 1919, and about 1920 he began to live in a tent out in his yard. In August, 1922, he was examined by government doctors, who found that he had active tuberculosis, and he was sent to Dawson Springs, a government hospital for tubercular patients, January 10, 1923. After being there for three months, appellee left the hospital against the advice of the doctors and returned home. He continued to live outside in the tent until 1925, when he moved to a farm where he has lived since. He has done nothing that could be called labor, has never been able to care for his farm or poultry, and has been bedridden for much of the time.

In this, as in other cases of the same character, there is decided disagreement among the medical witnesses as to the duration, extent, and character of the disability of the soldier. Opinions of the various doctors ranged from positive testimony that he was totally and permanently disabled at the time his policy lapsed, through testimony that he had been totally disabled since the time of his discharge and very probably permanently so, to testimony by government doctors that he has never had tuberculosis and has never been totally disabled.

This court has repeatedly said that to establish a right to recover on these policies of insurance it is necessary that the soldier

establish by substantial proof that he was totally and permanently disabled at the time when the policy lapsed, and that proof of incipient tuberculosis is not sufficient to warrant submitting the issue to the jury. United States v. Landrieux, 75 F.(2d) 536; United States v. Krueger, 77 F.(2d) 171. See, also, Falbo v. United States, 291 U. S. 646, 54 S. Ct. 456, 78 L. Ed. 1042; United States v. Spaulding, 293 U. S. 498, 55 S. Ct. 273, 79 L. Ed. ——; Nicolay v. United States (C. C. A.) 51 F.(2d) 170. The government contends that in consistency with the holdings in the above-cited cases and others, the trial court should have directed a verdict against appellee in the instant case.

Our examination of the record in this case convinces us that we have here something more than a case of incipient tuberculosis. It is the history of a man who broke down completely under the exertion, exposure, and irregularity incident to a soldier's life. He was discharged as totally unfit for military duty. Conceding that most, if not all, people at some time have incipient tuberculosis and that a large percentage of those afflicted with this disease recover even after it has reached a moderately advanced stage, yet the probabilities of recovery are materially lessened when the individual who has contracted tuberculosis is already broken in health and has a heart disorder which "works against his lung condition." Though he has abstained from physical exertion and spent much of his time in bed and outdoors for a period of fifteen years, a cold followed by pneumonia increased the malignancy of the disease from which appellee suffered and his condition is in no wise improved. We may properly consider the evidence as to the progress which appellee has made toward recovering from his disorders in so far as it tends to show whether he was totally and permanently disabled before the policy lapsed. Lumbra v. United States, 290 U. S. 551, 560, 54 S. Ct. 272, 78 L. Ed. 492. Considering the complexity of the disorders from which appellee suffered and the substantial evidence that he has been totally disabled and has made no material improvement during a period of over fifteen years under the care and advice of doctors and specialists in tuberculosis, the court finds that the question of whether appellee was totally and permanently disabled at the time of the lapse of the policy was properly submitted to the jury.

Affirmed.