## LUMBRA v. UNITED STATES.

No. 152. Argued November 17, 1933.—Decided January 8, 1934.

Mr. *Warren E. Miller* for petitioner.

Mr. *Will G. Beardslee,* with whom *Solicitor General* *Biggs, Assistant Solicitor General MacLean,* and *Messrs. Randolph C. Shaw* and *W. Clifton Stone* were on the brief, for the United States.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Petitioner was a private in the army of the United States from July 14, 1917, to April 29, 1919. In September, 1917, he obtained war risk insurance against death or total permanent disability. May 31, 1919, the policy lapsed for nonpayment of premiums. November 30, 1931, he brought this suit in the federal district court for Vermont alleging that before May 31, 1919, the policy was matured by his total permanent disability. Issue having been joined, there was trial by jury. At the close of all the evidence respondent requested the court to direct a verdict in its favor. The court denied the motion and, the jury having found for petitioner, entered judgment in his favor. The Circuit Court of Appeals reversed. 63 F. (2d) 796.

Petitioner's claim is that while the policy was in force he became subject to recurring spells of headache, dizziness, epileptic seizures and other illness constituting total permanent disability. The Circuit Court of Appeals held

the evidence not sufficient to show total permanent disability of petitioner while the insurance was in force. The question presented is whether there was any evidence upon which a verdict for petitioner might properly be found. And, for its decision, we assume as established all the facts that the evidence supporting petitioner's claims reasonably tends to prove and that there should be drawn in his favor all the inferences fairly deducible from such facts. *Gunning* v. *Cooley*, 281 U.S. 90, 94.

Before joining the army, petitioner was a laborer and worked cutting logs, building roads and as a farm and factory hand. When enrolled he was a healthy and strong man of 25 years. He served overseas in a machine gun company. One of his ankles was injured June 16, 1918, and two days later he was taken for treatment to a base hospital where he remained about a month. It was there recorded that, while going into a dugout, he had slipped and severely sprained his ankle; that there was no fracture, and that his general condition, heart, lungs and nervous system, were satisfactory. When discharged from the hospital, he joined his company, and remained with it until mustered out at Camp Devens, Massachusetts, April 29, 1919. The official record shows that upon a careful examination at that time by an army surgeon he was found mentally and physically sound; that he declared he had no reason to believe he was impaired in health or was suffering from the effects of any wound, injury or disease; and that his company commander had no reason to believe he then had any wound, injury or disease.

In 1920 petitioner several times consulted Dr. Frank B. Hunt, who certified, December 7, 1920, he found petitioner suffering from rheumatism, chronic bronchitis and nervousness. At the trial Dr. Hunt testified that petitioner was not, when examined, totally incapacitated and did not complain of having had epileptic seizures of any

kind. It seems that the certificate was intended for use in support of an application to the United States for compensation.[1] And, apparently in connection with such an application, petitioner was examined by Dr. Byron Herman of the Public Health Service. Under date of December 10, 1920, Dr. Herman reported that while in the army petitioner was never sick, although in the hospital once for a sprained ankle; that he became ill after getting home, and that he then complained of rheumatism, throat trouble, and husky voice. The doctor's diagnosis was chronic rheumatism and chronic laryngitis; his prognosis was: " Good." He reported that petitioner was able to resume his former occupation; that the degree of vocational handicap was negligible, and that vocational training was feasible.. January 17, 1921, petitioner verified an application for compensation stating that he was suffering from bronchial troubles, rheumatism and nervousness, which commenced about a year earlier and were caused by gas and exposure in France. And, in March, 1922, claiming to be partially disabled by reason of ailments of the lungs and throat, petitioner made application for compensation and training.

In April, 1924, and in January, 1925 and 1926, petitioner was examined by Dr. Waldo J. Upton, a specialist in nervous and mental diseases. He represented that he had no injury or illness during his military service and was in good physical condition when discharged, but that a few months later he became nervous, weak and unable to endure noise. The doctor diagnosed the case as one of mild neurasthenia characterized by weakness, irritability and

---

[1] Compensation for death or disability resulting from personal injuries suffered or disease contracted in the line of duty was provided by Art. III, Act of October 6, 1917, 40 Stat. 405, as amended. The grant of insurance was authorized by Art. IV, Act of October 6, 1917, *supra*, p. 409, as amended.

See *Runkle* v. *United States*, 42 F. (2d) 804, 806.

quick fatigue under stress. He found petitioner able to work at any occupation involving light labor, with reasonable regularity and without danger. He also examined petitioner in 1928, 1929 and 1930. At the first examination petitioner reported that in 1926 and 1927 he had suffered attacks of unconsciousness. The doctor found petitioner suffering from severe neurasthenia and severe hysteria. In 1930 he found petitioner had pronounced psychoneurosis and that his condition suggested he was developing grand mal epilepsy. The doctor's testimony indicates that from 1924 petitioner's condition became progressively worse.

In 1926, Dr. Herman found petitioner was having grand mal epileptiform seizures. He prescribed medicine and sent petitioner to a government hospital where he remained a month. In August, 1927, Dr. James O'Neill examined him. Petitioner said he had not been sick in the army and had sustained no injury except to his ankle and a slight gassing, but that he had been nervous practically from the time he left the army. Within the previous year he had suffered infrequent fits and had not then worked for nine weeks. His ailment was diagnosed as severe hysteria and the doctor was of opinion he could have worked. In March, 1929, Dr. Alan Davidson made a diagnosis of epilepsy. Petitioner then said he had been having uncontrollable nervous attacks which began when he was in the hospital in France.

Petitioner had no medical treatment between 1920 and 1926. From that time to 1930 he was sent to the hospital seven times and received treatment for periods ranging from two to eight weeks. The government granted petitioner's applications for compensation. Commencing in 1924 he was rated 10 per cent. disabled and paid $9 or $10 a month. Later, increases for disability were found and more compensation was allowed until in August, 1930, his disability was rated at 100 per cent. and he was given

$94.50 per month in addition to $10.50 allowed for his child.

From July, 1919, until the beginning of March, 1929, it appears that petitioner was employed more or less regularly except for periods aggregating about two years for which he does not account. Until January, 1921, he worked in a veneer factory. He was discharged, he testified, because he lost too much time by reason of weakness and dizzy spells. Then he helped on his sister's farm for three or four months. The next definite information as to his employment is that in July, 1922, he commenced as a machinist's helper in the shops of the Central Vermont Railway Company. He worked about two-thirds of full time until May 15, 1923, when he was laid off on account of force reduction. It does not appear what he did from then until February 18, 1924. At that time he was again employed by the Central Vermont, and worked nearly full time as a laborer until May when he quit in order to work in the Boston & Maine Railroad shops. In the following November he was discharged because, as he said, illness caused him to lose too much time. In December, 1924, he was employed for the third time by the Central Vermont. He worked about 85 per cent. of the time until August 23, 1926. Then he went to the hospital for a month, but he did not return until November; he worked nearly full time for the remainder of the year. In 1927, he worked about half time: that is, until the end of June he worked about 85 per cent. of full time, he then went to the hospital for an undisclosed period, and in October and November he worked about 70 per. cent. of full time. Then he was out until the end of January, 1928. Thereafter, until he was discharged in March, 1929, he worked about 80 per cent. of full time.

On each of the three occasions he went to work for the Central Vermont, he made application for employment in which he represented himself to be free from bodily

complaints and of a strong constitution. The record contains testimony that throughout the period of this employment petitioner seemed tired and ill, that he was transferred a number of times to lighter work, and that, had he not been a veteran, he would have been discharged:

The substance of petitioner's testimony, in so far as it adds materially to the facts and evidence above referred to, may be stated briefly:

June 16, 1918, a shell explosion threw him, injured his ankle, shocked him severely, and caused him to lose consciousness for a time and to suffer spells of dizziness, headaches, weakness and great perspiration at least once a week during the month he remained in the hospital. Desiring to leave the hospital, he refrained from disclosing his illness to attending physicians or others. After he resumed active service, the spells became worse. He disclosed his condition to the company commander and because of it was assigned to work in the kitchen. He did not get better while in France. After discharge, April 29, 1919, he went to his mother's home in Vermont and rested for some months. The spells continued, grew worse and sometimes would last a day. After commencing work in July, 1919, he was unsteady and weak, lost much time and on account of his condition was given lighter work and finally discharged in January, 1921. Early in 1923, he suffered a seizure in which he lost consciousness for about 15 minutes. So far as appears, this was the first seizure in which petitioner fell or became unconscious. Later he suffered such attacks with increasing frequency and intensity.

At the trial, medical men gave opinion evidence which, when considered in connection with the facts and circumstances rightly to be taken as proved, is sufficient to sustain a finding that petitioner's illness before and after the lapse of the policy resulted from injuries and exposure

while in the military service and that the epileptiform and epileptic fits, such as that suffered March 1, 1923, and later, are not curable.

The war risk contract unqualifiedly insures against "total permanent disability." The occasion, source or cause of petitioner's illness is therefore immaterial.[2] His injuries, exposure and illness before the lapse of the policy and his condition in subsequent years have significance, if any, only to the extent that they tend to show whether he was in fact totally and permanently disabled during the life of the policy.[3] March 9, 1918, in pursuance of the authorization contained in the War Risk Insurance Act,[4] the director of the bureau ruled (T.D. 20 W.R.): "Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed . . . to be total disability. Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

The phrase "total permanent disability" is to be construed reasonably and having regard to the circumstances of each case. As the insurance authorized does not extend to total temporary or partial permanent disability, the

[2] *United States* v. *Golden,* 34 F. (2d) 367, 370. *United States* v. *Tyrakowski,* 50 F. (2d) 766, 768.

[3] *Carter* v. *United States,* 49 F. (2d) 221, 224. *Eggen* v. *United States,* 58 F. (2d) 616, 619. *Wise* v. *United States,* 63 F. (2d) 307, 308. *United States* v. *Clapp,* 63 F. (2d) 793, 795. *United States* v. *Linkhart,* 64 F. (2d) 747, 748.

[4] ". . . The director, subject to the general direction of the Secretary of the Treasury, shall administer, execute, and enforce the provisions of this Act, and for that purpose have full power and authority to make rules and regulations, not inconsistent with the provisions of this Act, necessary or appropriate to carry out its purposes . . ." § 13, added by § 2, Act of October 6, 1917, 40 Stat. 399.

tests appropriate for the determination of either need not be ascertained. The various meanings ·inhering in the phrase make impossible the ascertainment of any fixed rules or formulae uniformly to govern its construction. That which sometimes results in total disability may cause slight inconvenience under ·other conditions. Some are able to sustain themselves, without serious loss ·of productive power, against injury or disease sufficient totally to disable others. It cannot be said that injury or disease sufficient merely to prevent one from again doing some work of the kind he had been accustomed to perform constitutes the disability meant by the Act, for such impairment may not lessen or affect his ability to follow other useful, and perchance more lucrative, occupations. Frequently, serious physical impairment stimulates to successful effort for the acquisition of productive ability that theretofore remained undeveloped.

The above quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed. If read literally, every impairment from time to time compelling interruption of gainful occupation for any period, however brief, would be total disability. And, if such impairment were shown reasonably certain not to become less, it would constitute total permanent disability. Persons in sound health occasionally suffer illness requiring them to remain in bed for a time. It is not inaccurate to describe such illness as " total disability " while it lasts. But clearly it is not right to say that, if they remain sound but reasonably certain throughout life occasionally to have like periods of temporary illness, they are suffering from ·" total permanent disability." Such a construction would be unreasonable and contrary to the intention of Congress. " Total disability " does not mean helplessness or com-

plete disability, but it includes more than that which is partial. "Permanent disability" means that which is continuing as opposed to what is temporary. Separate and distinct periods of temporary disability do not constitute that which is permanent. The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable and at the risk of endangering his health or life.[5] But manifestly work performed may be such as conclusively to negative total permanent disability at the earlier time.[6]

It requires no discussion to show that the evidence in respect of petitioner's condition during the life of the policy has no substantial tendency to prove total permanent disability at the time of the lapse. The evidence as to his subsequent condition may be considered only for the purpose of determining his condition while the contract was in force. His conduct following the alleged accrual of his claim reflects his own opinion as to whether he was totally and permanently disabled at the time of the lapse. His own statements to medical men, their diagnoses, his repeated applications to the Government for compensation and his failure earlier to assert any claim show that for a decade he did not believe that he was totally and permanently disabled when he let his policy lapse May 31, 1919. And in the absence of clear and satisfactory evidence explaining, excusing or justifying it, petitioner's long delay before bringing suit is to be taken

---

[5] *United States* v. *Phillips,* 44 F. (2d) 689, 691. *United States* v. *Godfrey,* 47 F. (2d) 126. *Carter* v. *United States,* 49 F. (2d) 221, 223. *United States* v. *Lawson,* 50 F. (2d) 646, 651. *Nicolay* v. *United States,* 51 F. (2d) 170, 173.

[6] *United States* v. *Harrison,* 49 F. (2d) 227. *Nicolay* v. *United States,* 51 F. (2d) 170, 173–4. *United States* v. *Perry,* 55 F. (2d) 819, 824. *United States* v. *McGill,* 56 F. (2d) 522, 524. *United States* v. *Diehl,* 62 F. (2d) 343, 344.

as strong evidence that he was not totally and permanently disabled before the policy lapsed.[7]

It may be assumed that occasional work for short periods by one generally disabled by impairment of mind or body does not as a matter of law negative total permanent disability. But that is not this case. Petitioner while claiming to be weak and ill and, contrary to the opinion and diagnoses of examining physicians, that he was really unable to work, did in fact do much work. For long periods amounting in the aggregate to more than five years out of the ten following the lapse of the policy he worked for substantial pay. No witness, lay or expert, testified to matters of fact or expressed opinion tending to support petitioner's claim that he had suffered " total permanent disability " before his policy lapsed. Unless by construction these words are given a meaning far different from that they are ordinarily used and understood to convey, the evidence must be held not sufficient to support a verdict for petitioner. The trial court should have directed a verdict for the United States. *Gunning* v. *Cooley,* 281 U.S. 90, 93. *Stevens* v. *The White City,* 285 U.S. 195, 204.

*Affirmed.*

---

[7] *United States* v. *Hairston,* 55 F. (2d) 825, 827. *Wise* v. *United States,* 63 F. (2d) 307, 308. *United States* v. *Linkhart,* 64 F. (2d) 747, 748. And see *United States* v. *Eggen,* 58 F. (2d) 616, 618.