**UNITED STATES v. SANDIFER.**

No. 7368.

Circuit Court of Appeals, Fifth Circuit.
March 4, 1935.

552

Philip H. Mecom, U. S. Atty., and J. Fair Hardin, Asst. U. S. Atty., both of Shreveport, La., and Young M. Smith, Atty., Department of Justice, of Washington, D. C., for the United States.

K. Hundley, of Alexandria, La., for appellee.

Before BRYAN, HUTCHESON, and WALKER, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was on a war risk insurance contract. Appellant seeks a reversal on one ground, that plaintiff did not prove total and permanent disability occurring before the lapse of his policy, and the court erred in not instructing the jury so.

Here appellant, conceding that plaintiff did show that he has had active tuberculosis at times totally, and at times partially, disabling him, insists that plaintiff failed to show that the disablement it caused is now, or was ever, total and permanent, and particularly that he failed to show that it so existed when the policy would have otherwise lapsed. It insists that while it may be doubted whether the evidence is sufficient to make a jury issue as to his ever having been totally and permanently disabled, it is certain that there is no evidence that he was so disabled on September 1, 1919, when the policy lapsed for nonpayment of premiums.

We do not think it necessary to consider whether the evidence shows plaintiff to be totally and permanently disabled now, for we think it may not be doubted that it is insufficient, as matter of law, to support a verdict that he became so while his policy was in force by payment of premiums.

Plaintiff, a young Mississippi farmer, twenty-one years of age, was found by the local board to be physically qualified for general military service, and on February 8, 1918, ordered inducted. His preliminary physical examination, dated February 2, and his statements made at the time, show that his health was good, that he had not been treated in a hospital nor confined to bed for any ailment. That his weight was 133 pounds, his height 71¼ inches, his chest 31-34, heart and lungs normal, and that he was physically qualified for military service. His examination at the place of mobilization, Camp Pike, Ark., June 3d, showed the same findings, except that his weight was 130 pounds instead of 133. The report of his physical examination prior to separation from the service at Camp Shelby, July 18, 1919, and his declarations then, showed no injury or disease either apparent or claimed. There is neither hospital nor medical record, nor medical testimony, showing or even pointing to plaintiff's having tuberculosis while he was in the army, or until some time in 1921, nearly two years after his discharge, when he was hospitalized and a diagnosis of active tuberculosis made.

To bridge the gap between 1921, when this diagnosis was made, and July, 1919, when he was discharged from the army as without disability, plaintiff relies entirely on lay testimony, his own and that of his brother and a neighbor, as to his appearance and actions after he came out of the army. This is the substance of his brother's testimony: "My brother's condition and general appearance when he arrived from the army, he seemed to be a little bit handicapped, unnerved, seemed to be quite fidgetty, or fidgified. He arrived in the summer and rested around there during the summer months. He did not look to be hardly as heavy when he arrived home. He did not do anything for a good long while, and then just ordinary farm labor. He might have done a little work. I don't know, and I don't think he knew, what was the matter with him. He was in bed part of the time, some days up a little. He complained of his back and shoulders, complaining of something hurting him in the lower parts. I would say the time he worked was not as much as half the time. He spent a good deal of time in bed."

J. D. Barron, a neighbor, testified to having known Sandifer and remembering when he went into the army and when he

returned. He would see him right after he came back one to three, maybe four or five times a week. His general appearance upon his return from the army as compared with his appearance when he left, "I would say when he left home he was active and worked at public works and on the farm, and after he came back I never knew of his doing any work. When he came home he looked peaked, and did not have any life about him. When he went into the army I figured he must have weighed 140 pounds; when he came back, 125. I did not see him do anything about the farm after he came from the army. I visited him and he was in bed a time or two."

The substance of his own testimony is that before he had influenza in France his average weight was from 148 to 155 pounds fully dressed, once in France he weighed as much as 170 pounds. That since his influenza his weight has never gone above 133 pounds. Abroad his activities were mainly those of a woodsman. Attached to the quartermaster's department at Spur, where a camp was being built, plaintiff was sent into the forest to cut trees for fuel and stayed at that work 2½ months. In October, 1918, he had influenza, and was confined to quarters for about two months. After getting up from that he would go out to work for part of the day and then would have to go back. Later on he was sent into the forest with a crew to pick up wood for cooking, and while so engaged fell off a wagon, receiving a hurt which confined him to quarters for about six weeks. After that, though he was coughing, they put him out cutting up wood while others loaded it. In February, 1919, he had another attack of flu which laid him up for about a week, and after that he went back to Spur. There he was put on light duty as a helper on a truck, his duty being "to pick up wood all over France the rest of the time he was in the army." Leaving France June 27, 1919, he arrived at Camp Shelby July 5, as he puts it, "in a weak, run down condition, and could not hold out to do work." Discharged after seven days, he went back to his mother's farm. As to his statements made at the time of his discharge, that he had no disability, he testified he made them because he was so anxious for a discharge he would have said anything to get it.

As to what he did after returning home he testified: "During the remaining portion of the year in regard to my physical condition, I began to work on the farm. There was not a lot of work to do and I worked a day or two at a time, and then would give out and could not hold out, and I complained to the folks every day and told them there was something wrong with me. I didn't know what it was. I didn't know that I could get aid from the Government and I just kept dragging along there and resting all of that year, and did no work to amount to anything. I was not able to do anything at all the first six months of 1920. I tried to work a little on the farm but I had to stay in bed practically all the time. The latter part of 1920 I didn't work but just a day or two out of the week. It seemed that there was a change in my physical condition and I was getting weaker and run down more all the time and losing weight rapidly. During the latter part of 1920 I found out I could get aid from the Government and in the spring of 1921 they gave me an examination and sent me to the Public Health Hospital at Alexandria. Arriving there June 3, 1921, I was transferred to the active tuberculosis ward where I stayed until the fall of 1922. I know that I have had temperature ever since I left the army. I have taken it regularly. It has run 99½ and as much as 100. I took my temperature the first time under the advice of my physician in Mississippi directly after I was discharged. I have had night sweats. They first began when I was discharged out of the army, and I still have them. There has not been any period of time since I was discharged that I have not had night sweats. I cannot say that I have felt a bit better since I was discharged than I do today. When I take rest periods it enables me to carry on although ill. The way I have been getting along, when I was first discharged I had saved up quite a bit and I borrowed some. That kept me until I connected up with the Government and got compensation, and I have been living on compensation ever since. I am now drawing $50 a month compensation on a diagnosis of arrested tuberculosis. Just before I was put on $50, I was drawing $110 rating total permanent. I have drawn all the way from $9 to $110."

■ The rest of his testimony had to do with what he had done and his condition since 1922, as did all of the testimony of all the rest of the witnesses. Plaintiff's medical testimony consisted of that of two physicians, who, examining him first in 1930, denied the diagnosis of arrested tuberculosis to which all of defendant's physicians tes-

tified. Defendant had several physicians, including three X-ray experts. These testified to an arrested condition since 1925, and that X-ray pictures, taken in 1932, showed no present active tuberculosis, and very little evidence of its past ravages. Plaintiff's doctors thought his condition such as that he could not, without injury to his health, follow a gainful occupation; defendant's all swore that he could. Plaintiff's testimony as to conditions after 1922 made a picture of alternating hospitalization and rest on his mother's farm, hospitalization and rest there again, interspersed with some periods of work, his marriage and the birth of several children, and a continued drawing of compensation. This testimony as to conditions after 1922 is the basis of defendant's claim that the evidence shows, as matter of law, that tuberculosis appeared in 1921, became arrested in 1925, and that plaintiff is not now, and has not been since then, totally and permanently disabled; and of plaintiff's, that this was matter of fact for the jury. Because we think it clear that plaintiff failed to show the first essential of recovery, the onset of this disablement, permanently and totally disabling him while his policy was in force, and it is therefore immaterial whether he since became so, it will serve no purpose to set this evidence out more fully. Without medical testimony that he was at all disabled when he left the army; without any as to when the tuberculosis, which the examination in the spring of 1921 disclosed, first made its onset in disabling form; without any as to what it was he was suffering from before 1921, as told by his brother, his neighbor and himself, it cannot be said that plaintiff's case was made out. True, it is possible that plaintiff might have had incipient tuberculosis when he left the army, but nobody testified that he had, nor is there anything in the evidence from which this may be reasonably legally inferred. Plaintiff could not sustain his claim by showing that the condition he now claims as permanent might have arisen while his policy was in force. He must show that it did. To sustain it he must show "by evidence contemporaneous with the life of the policy, the then totality and permanence of his disability as a fact existing and accepted, or he must show conditions then existing which, read in their own light and in the light of subsequent events, make it reasonably probable that, though then unclaimed and unrecognized, total and permanent disability did then in fact exist. It is not enough that the evidence afford a basis for a possible inference that it did; it must make the inference that it did appear reasonably probable." Wise v. United States (C. C. A.) 63 F.(2d) 307, 308.

Further, if it could be said that there was sufficient evidence to show that tuberculosis was incipient when he left the army, there was nothing to show that it was permanent, for it is quite clear that plaintiff did nothing to find out his condition and check the progress of the disease. His brother testified, "I do not know and I do not think he knew, what was the matter with him." He testified, "I complained to the folks every day, and told them there was something wrong with me; I did not know what it was," and "In the latter part of 1920 it seemed there was a change in my physical condition, and I was getting weaker and run down more all the time and losing weight rapidly." As in Falbo's Case (C. C. A.) 64 F.(2d) 948; Rentfrow's Case (C. C. A.) 60 F.(2d) 488; Walters' Case (C. C. A.) 63 F.(2d) 299, and Wise's Case, supra, plaintiff left in the realm of speculation, not only the matter of whether he had tuberculosis at that time, but whether if he had it then, it was reasonably certain that it was permanent. There is nothing in plaintiff's evidence as to his condition when his policy lapsed which affords more than a basis for surmise, speculation, and conjecture that he was totally and permanently disabled then. Verdicts of juries must have something more firm to rest on than this. This is a case like Crume's Case (C. C. A.) 54 F.(2d) 556; Cunningham's Case (C. C. A.) 67 F.(2d) 714, and Wise's Case. Particularly when one waits, as plaintiff has done, more than fourteen years to press a war risk suit, he must rest his claim on firm ground. Wise v. United States, supra; United States v. Mintz (C. C. A.) 73 F.(2d) 457; Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492.

There was no solid ground for the verdict. Defendant's requested instruction should have been given. Because it was not, the judgment is reversed, and the cause remanded.