## UNITED STATES v. WEST.
### No. 1183.

Circuit Court of Appeals, Tenth Circuit.
July 5, 1935.

Randolph C. Shaw, Sp. Asst. to the Atty. Gen. (Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., Will G. Beardslee, Director, Bureau of War Risk Litigation of Washington, D. C., and Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., on the brief), for the United States.

Harry L. Thomas, of Kansas City, Mo. (George E. Gard, of Kansas City, Kan., on the brief), for appellee.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

This is a suit upon a war risk insurance contract. The alleged disability is mental, that is a complete shattering of the nervous system. A jury was waived, and we are called upon to determine whether the finding that insured became totally and permanently disabled on June 9, 1919, is supported by substantial evidence.

Insured completed a high school education and entered the State Teachers College at Pittsburg, Kansas. After being there for almost a full term he enlisted on May 16, 1918, and was discharged on June 9, 1919. He was in good health before enlisting. Soon after entering the service he was assigned to the Field Artillery and went to France, but was not in combat. Some time in November he slipped and fell and struck his head against the base or wheel of a gun. He believes that he was unconscious for a short time, but is uncertain about it. He made no report of the incident and was not hospitalized. Some of his comrades suggested that he go to a hospital, but he declined to do so, saying that he preferred to be with them. Except for influenza, rheumatism, and the incident just detailed, there is no suggestion of accident, illness, or anything unusual during his service of slightly more than twelve months. Upon discharge he made the quite common statement in connection with a physical examination, that he was not then suffering from the effects of wound, injury, or disease.

Upon his return home insured's eyes did not look good; they were shiny; his hair was beginning to turn gray; he seemed restless and nervous; he would not sit down and did not want to approach members of his family. His mother took him to the local chapter of the Red Cross for the purpose of obtaining assistance in the preparation of a claim for disability compensation. At first he seemed suspicious of the women in charge there and assumed a hostile attitude toward them and they were afraid of him. His attitude later changed into one of resignation and their fear ceased. A male nurse was employed and attended him for about six months, but the exact time is not fixed in the record. He was taken to the Mayo Clinic, but the diagnosis made there was not produced at the trial. His father was told that nothing could be done to keep him at work. Again the exact time is not fixed. The record indicates that he went there shortly before guardianship proceedings were instituted. That was done June 2, 1920, almost a year after he ceased to pay premiums on his contract. His father was appointed guardian of his person and estate in June, 1920, but during the succeeding April the court found upon application of the father that insured had regained mental competence and thereupon the guardianship was terminated. Several lay witnesses who met him at different times following his return home testified that he seemed nervous and that his hands shook. He married in De-

cember, 1922. He and his wife first met in March of that year. She testified that he was sick at the time, but she did not know what was the matter with him; that after their marriage he was extremely nervous, easily excited, cried at times while studying and sometimes threatened to harm himself. He has helped her some with washing, but has done little else. He took vocational training at the teachers college in Pittsburg during 1922, 1923, and 1924 and studied chemistry, algebra, geometry, trigonometry, and English, as well as various electrical and mechanical subjects. His attendance there was fairly regular, being absent on only 21 occasions throughout that period, and he made B and C grades in several subjects. He secured a job winding armatures in 1926, but his work became unsatisfactory and after a few months he was discharged. He could wind one or two armatures very well, but if several were waiting to be wound he would become excited and could not accomplish anything. He was a clerk at a primary election and did very well recording names of voters during the day, but became so disturbed and exhausted during the count that he was removed at about ten o'clock that night; however, that occurred in August, 1932.

The only medical testimony offered in behalf of insured was that of Doctor Campbell, but he did not know insured until 1926 or 1927. He examined him then and found that he was very unstable, highly nervous, not in good muscular condition, and was unable to do any kind of work. He expressed the view that the condition was the result of shell shock which rendered insured unable to control his nervous system. Doctor Pottorf, chief of the nervous and medical division of the Veterans Bureau in Kansas City, called as a witness by defendant, examined insured twice, first in 1925 and next in 1928. His diagnosis was neurasthenia and constitutional psychopathic inferiority. It was his opinion that insured's chief difficulty was lack of will power and that he was not disabled to exceed 10 per cent.

Insured has worked very little since returning from the service, and it has been punctuated with frequent and long interruptions.

█ The determinative date in this case is June 9, 1919. In order to recover, insured must show by substantial evidence that he was totally and permanently disabled at that time. His army record fails to reflect accident or serious illness during service. He stated upon discharge that he was not suffering from injury or disease. His father was the only witness in the case who saw him immediately after his return home, and his testimony is vague with respect to the time and order in which subsequent events transpired. The other lay witnesses did not see him immediately after his return; they first saw him at different times later, and the composite of their testimony was that he was nervous; that his hands were shaky; that he was a changed person; and that he was suspicious or hostile toward those in charge of the Red Cross service. The testimony with respect to the trip to the Mayo Clinic has little value because the diagnosis made was not shown and the time was not fixed, the record indicating that it was almost a year after his return home. The views expressed by Doctor Campbell fail to supply probative support because he did not see the patient until seven or eight years after his discharge. Of course, the testimony should be viewed in the light most favorable to the insured. But thus viewed, it leaves his condition during June, 1919, in the realm of surmise, speculation, or conjecture. A finding of total and permanent disability cannot rest upon that basis. United States v. Crume (C. C. A.) 54 F.(2d) 556; Wise v. United States (C. C. A.) 63 F.(2d) 307; United States v. Howard (C. C. A.) 64 F.(2d) 533; United States v. Sandifer (C. C. A.) 76 F.(2d) 551; United States v. Clapp (C. C. A.) 63 F.(2d) 793; Cunningham v. United States (C. C. A.) 67 F.(2d) 714; United States v. Hodges (C. C. A.) 74 F.(2d) 617.

█ In addition to the fatal weakness of the evidence adverted to, the long delay of more than thirteen years in filing suit is a circumstance which suggests strongly that insured did not believe he was totally and permanently disabled while the policy was in force. Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492; United States v. Spaulding, 293 U. S. 498, 55 S. Ct. 273, 79 L. Ed. 617; Miller v. United States, 294 U. S. 435, 55 S. Ct. 440, 79 L. Ed. 977.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent herewith.