### ELLIOTT v. UNITED STATES.

District Court, E. D. Kentucky, at Lexington.

Dec. 30, 1935.

Perry B. Miller, of Louisville, Ky., for plaintiff.

Mac Swinford, U. S. Dist. Atty., of Lexington, Ky., for the United States.

FORD, District Judge.

The plaintiff, James Marcus Elliott, was inducted into the United States Army on June 24, 1918. He was sent to Camp Taylor at Louisville, Ky., where he was engaged in the usual army camp routine until December 12, 1918, when he was discharged. During his period of service in the army he applied for and was granted a war risk insurance policy by the terms of which the government insured him against "total permanent disability," while the policy was in force, in the sum of $10,-000. The premiums on the policy were deducted from his monthly pay, while he was in the service. No premiums were paid after his discharge on December 12, 1918.

On April 26, 1932, the plaintiff filed this action alleging that during his military service and while his said policy of insurance was in effect, he became totally and permanently disabled from the effects of pulmonary tuberculosis. By an amended petition filed March 21, 1933, he alleged that at the time payment of his premiums was discontinued, he was suffering from compensable disabilities for which compensation was not collected until October, 1921; that his uncollected compensation was more than sufficient to have paid the premiums accruing on his policy, and that under the provisions of section 305 of chapter 320 of an Act of Congress of June 7, 1924 (43 Stat. 626, title 38, § 516, U.S.C.A.) his insurance policy continued in full force and effect to and including October, 1921. He further alleged that he also con-tracted and suffered valvular heart trouble, mitral insufficiency and neurasthenia, which resulted in his total and permanent disability during the life of the policy.

A jury was waived, and the case was submitted to the court upon the law and facts.

It appears that under the act of June 7, 1924, above referred to, the plaintiff's insurance remained in full force and effect to and including the month of October, 1921. United States v. Sellers (C.C.A.) 75 F.(2d) 623.

In addition to the question as to the extent of the plaintiff's disability, we are confronted with the equally pertinent and perhaps, here, the dominant question as to whether the ailment to which he attributed his disability was incurable or became permanent in its nature, before the lapse of his policy of insurance. The policy here sued on did not insure against total disability of merely uncertain or doubtful duration, nor against total disability as to which a state of permanence or incurability may not have been reached until after the lapse of the policy.

It is settled law that to justify recovery in cases such as this, where there has been long delay in instituting suit, the burden rests upon the plaintiff to clearly and definitely show, as an affirmative fact, that, while the policy was in force, his disability was not only total, but was also, with reasonable certainty, permanent. Neither of these essential facts may be left to mere conjecture or doubtful inference. A few of the latest cases in point are: Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492 (decided January 8, 1934); United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (decided January 7, 1935); Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977 (decided March 4, 1935); United States v. Hodges (C.C.A.6th Cir.) 74 F.(2d) 617 (decided January 8, 1935); United States v. Reeves (C.C.A.6th Cir.) 75 F.(2d) 369 (decided February 13, 1935); Boone v. United States (C.C.A.4th Cir.) 79 F.(2d) 702 (decided October 21, 1935); United States v. West (C.C.A.10th Cir.) 78 F.(2d) 785 (decided July 5, 1935); United States v. Cobb (C.C.A.5th Cir.) 77 F.(2d) 138 (decided May 16, 1935), and Stephenson v. United States (C.C.A.8th Cir.) 78 F.(2d) 355 (decided June 29, 1935).

The plaintiff testified that prior to his entrance into the army and up until a short

time before his discharge he was in good health; that about a month before he was discharged he contracted a cough and began to be nervous; that this cough and nervousness was accompanied by considerable weakness; that these conditions continued after his discharge and grew progressively worse, causing night sweats and swelling in his joints, all of which resulted in sickness and weakness to such an extent that, although he attempted to do a small amount of work, he was unable to continue work with any degree of regularity. The only work he appears to have engaged in was to hoe the garden, take care of some saddle horses and look after some livestock for a short period of time. He married on February 14, 1922. At the time he testified, in March, 1933, he had three children. Several lay witnesses, who saw him and observed his appearance shortly after he was released from the army, testified that they observed his condition to be substantially as described by the plaintiff.

On December 25, 1918, the plaintiff was examined by Dr. I. S. Wesley, his own physician, of Casey county, Ky. He made an ordinary physical examination of the plaintiff's chest, and says, "my diagnosis was incipient tuberculosis." He saw plaintiff at intervals until about 1924. In answer to a question calling for the results of his examinations subsequent to 1918, he said: "Well, it was very much on the same order; I don't remember just exactly the details, but I guess somewhat more active after that, than it was at the beginning."

On January 24, 1921, the plaintiff was examined by Dr. Silas G. Cain, of Somerset, Ky., who reported to the War Risk Insurance Bureau that he found the plaintiff with a severe cough and "moist rales over both lungs." He thought this indicated tuberculosis, and advised an examination by a specialist in tuberculosis, which was ordered.

On February 16, 1921, Dr. John W. Scott, a specialist in tuberculosis, examined the plaintiff and reported that he had "chronic pulmonary tuberculosis" in an "incipient" stage which was then "quiescent."

In April, 1921, the plaintiff entered Waverly Hills Sanatorium at Louisville, Ky., for examination and inspection. He remained there under observation for a while during which time he was given a special examination for tuberculosis by Dr. Oscar O. Miller, a specialist in tuberculosis who was then the medical director of the sanatorium and of the tuberculosis clinic in Louisville. Dr. Miller testified that his examination of the plaintiff consisted of a "complete physical examination of the chest and a fluoroscopic examination." The result of Dr. Miller's examination he described as follows: "The physical examination of the patient was negative for pulmonary tuberculosis. Observation of his temperature while in sanatorium was normal; pulse rate was normal with one exception. The fluoroscopic examination revealed no pathology of the lungs."

The plaintiff was again examined by Dr. John W. Scott, of Lexington, a specialist in tuberculosis, on June 8, 1921, and he again reported a condition of "chronic pulmonary tuberculosis, quiescent, incipient."

This summary substantially covers the evidence relative to the plaintiff's condition up to and including the year 1921. It indicates pulmonary tuberculosis in 1921, and prior thereto, only in its incipient or early stage. There is no evidence of the existence of heart disease up to this time. The testimony of Dr. Miller, of Waverly Hills Sanatorium, indicates that the tuberculosis condition was completely arrested in April, 1921.

The other testimony relates to plaintiff's condition and the progress of his ailments subsequent to the lapse of his policy.

In support of his claim, the plaintiff introduced Dr. C. B. Gibson, a physician residing at Science Hill, Ky., not shown to be a specialist, but apparently a general practitioner. Dr. Gibson testified that in 1924 he attended the plaintiff and made a general physical examination of him. He found him suffering with a rapid, weak heart and with active pulmonary tuberculosis. Dr. Gibson gave it as his professional opinion that at the time he examined the plaintiff in 1924 he considered his condition undoubtedly permanent and incurable. Dr. Gibson, however, never saw nor examined the plaintiff prior to September, 1924, and his testimony relates to a condition claimed to have existed approximately three years after the lapse of the policy of insurance.

Turning again to the records of the bureau, it appears that on February 27, 1922, Dr. George W. Beach, of Cumberland Sanatorium at Somerset, Ky., discovered some reactivity and moderate advancement in the plaintiff's tubercular condition,

his prognosis however was "favorable," and on April 24, 1923, Dr. S. T. Scrivner examined him and reported his tuberculosis condition again "arrested." However, at this time, Dr. Scrivner found the plaintiff had developed valvular heart disease, a condition which evidently arose subsequent to the examination made by Dr. Beach who reported on February 27, 1922, that his heart condition was then "normal." An X-ray examination made by Dr. John C. Lewis, of Lexington, on October 15, 1923, showed his tuberculosis condition "apparently arrested," and on the same date Dr. J. D. Maguire and Dr. J. M. Morris, of Lexington, reported his tuberculosis condition "arrested." The subsequent medical reports of the bureau show his tuberculosis condition to have been arrested until December 30, 1929, when Dr. Lightner examined him and reported that, judging by the medical history, his tuberculosis condition was apparently cured.

Except for the testimony of Dr. C. B. Gibson as to his condition in 1924, the evidence is without dispute that from April 24, 1923, to December 30, 1929, a period of more than six years, the plaintiff's tubercular infection was "arrested" and apparently cured.

The same Dr. Lightner, a specialist in tuberculosis, of Louisville, Ky., whose examination in December, 1929, indicated the plaintiff to be apparently cured of tuberculosis, again examined him on June 18, 1930, and found him suffering with an active and far advanced case of pulmonary tuberculosis. Whether this recurrence of the disease was due to reactivation of a dormant infection or was attributable to a new infection rests within the realm of pure speculation. As to whether anything took place in the plaintiff's conduct or manner of living to cause this marked change, so sudden and severe, after so many years of quiescence, the record is silent.

The plaintiff was taken immediately to the United State Veterans' Hospital at Outwood, Ky. He remained there only about seven days, and left without permission. He says that illness of one of his children caused him to return to his home. On January 20, 1932, Dr. Lightner found him in a very critical condition at his home. He died on December 6, 1934.

■ By resolving in favor of the plaintiff every inference which may be fairly deduced from the evidence, the most that can be found as established with any degree of certainty or definiteness is that up to and including October, 1921, when his policy finally lapsed for nonpayment of premiums, the plaintiff was totally disabled as the result of pulmonary tuberculosis in its incipient or early stages. No witness testified that during the life of the policy the disease had advanced beyond its primary stage.

■ The courts take judicial notice of the fact that incipient tuberculosis may, with proper treatment, be completely arrested and substantially cured. In the case of United States v. Gwin (C.C.A.6th Cir.) 68 F.(2d) 124, 126, the court said: "There are, of course, a great number of maladies which are or may be steadily progressive, but which are not wholly incapacitating in their early stages. There are others which, though properly to be considered as total disabilities in the incipient stages, are often arrested to the extent that the patient may thereafter lead an industrious and a useful life. Pulmonary tuberculosis is one of the commonest of the latter class."

The latest case from the Sixth Circuit dealing with tuberculosis is that of United States v. Reeves (C.C.A.) 75 F.(2d) 368, 369 (decided February 13, 1935) in which the court said: "We may assume that deceased had contracted tuberculosis before the lapse of the policy; but the evidence fails to show that the disease had then advanced beyond a primary stage or that it had become permanent. * * * The burden was upon appellee to show that deceased had become totally and permanently disabled while the policy was in force. * * * The inference that he was then incurable is founded upon conjecture alone. As pointed out in the cases cited, incipient tuberculosis may, with proper treatment, be completely arrested and substantially cured. It is true that at some period in the progress of the disease disability became permanent, but the policy did not insure against such an event after its lapse."

■ Furthermore, the claim that permanent disability existed during the life of the plaintiff's policy is weakened by his own conduct subsequent to its lapse in 1921. As pointed out by the Supreme Court in the Lumbra Case, the failure of the plaintiff to assert a claim under his policy for more than ten years after its lapse strongly indicates that he did not believe he was permanently disabled at the time the policy lapsed. It is a settled rule that when, as

in this case, long delay remains unexplained, it is regarded by the courts as strong evidence against a belated claim of permanent disability. United States v. Hodges (C.C.A.6th Cir.) 74 F.(2d) 617.

The further fact that the plaintiff married in 1922 and voluntarily assumed the burdens and responsibilities of raising a young family is hardly compatible with the theory that he then regarded himself as permanently and totally disabled.

The evidence is insufficient to justify recovery by the plaintiff. Judgment will be entered for the defendant.