**UNITED STATES v. SPRUCE.**

No. 1716.

Circuit Court of Appeals, Tenth Circuit.

Nov. 12, 1938.

Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C. (Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Fendall Marbury, Sp. Asst. to Atty. Gen., and Young M. Smith, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Thomas F. Doran, Clayton E. Kline, M. F. Cosgrove, Balfour S. Jeffrey, and Robert E. Russell, all of Topeka, Kan., Wm. D. Reilly, of Leavenworth, Kan., and Francis C. Clark, of Topeka, Kan., for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Alfonso Spruce, original plaintiff herein, commenced the above entitled action in the District Court of the United States for the District of Kansas, Second Division, on July 3, 1931, serving a copy of his petition therein on the United States District Attorney for said district and mailing a true and correct copy thereof by registered mail to the Attorney General of the United States.

On September 22, 1931, defendant filed its answer.

Thereafter, jury having been waived, said cause having been heard, it was submitted to the court on February 25, 1937, when it was taken under advisement.

Thereafter on April 20, 1937, said Alfonso Spruce died intestate. On November 26, 1937, neither the court nor any agent or representative of the United States Government nor the attorney of the said deceased had any information of his death, on the date the court entered judgment in his favor, the court finding the issues in favor of the plaintiff and against the defendant. Thereafter on February 24, 1938, defendant did all necessary acts to perfect an appeal from said judgment, citation thereon having been duly presented to and acceptance signed by counsel for said Alfonso Spruce.

Thereafter, on March 16, 1938, Pearl Spruce was duly appointed administratrix of the estate of Alfonso Spruce, deceased, and granted letters testamentary thereon. On March 17, 1938, said Pearl Spruce, as such administratrix, filed a motion to revive said action in her name as personal representative as such administratrix, and asked to be substituted as party plaintiff therein. On March 29, 1938, all parties being in court represented by attorney, said court over objection and exception of counsel for the United States of America, after hearing the foregoing facts as to defendant's death at time of the entry of said judgment, entered an order finding that said judgment entered on November 26, 1937, was void on account of said plaintiff having died on April 20, 1937, prior to the date of the rendering of said judgment, and entered an order of revival, substituting said Pearl Spruce as such administratrix as party plaintiff and further over objection of counsel for said defendant, vacated said judgment of November 26, 1937, on the ground that it was void, and re-entered said judgment in favor of Pearl Spruce as such administratrix and against the United States, nunc pro tunc, as of February 25, 1937, the date that said cause was heard and taken under advisement, and on April 30, 1938, in due time after the entering of said judgment, defendant filed its petition for appeal and assignments of error, said court allowing such appeal and issuing citation thereon which was duly served upon counsel for said plaintiff, Pearl Spruce, administratrix, and thereafter on the same date, to-wit, April 30, 1938, said district court signed, settled and approved bill of exceptions, and duly settled the record.

Said intestate, Alfonso Spruce, in said action declared upon a $5,000 contract of War Risk Term Insurance, issued to him by the government on July 15, 1918, alleging that he became permanently and totally disabled during the period of insurance protection, as a result of pulmonary tuberculosis, and general disability. The United States Government denied the material allegations of said petition.

A jury being waived, the case was tried to the court and at close of all the evidence, said defendant moved for judgment in its favor under the record and all the evidence on the ground that there was no substantial evidence to prove permanent and total disability as alleged.

The court overruled government's motion for judgment, allowing an exception, and judgment in favor of said plaintiff was entered upon a finding that he became permanently and totally disabled as of March 25, 1919.

From the former judgment entered November 26, 1937, an appeal was duly allowed upon the filing of petition therefor and assignment of errors, and the time for settling bill of exceptions was extended to June 1, 1938, which was in due course settled. A citation on appeal was issued and service accepted thereon by insured's attorneys on February 25, 1938.

It is recited in the re-entered judgment that the court found that the former judgment had been entered under a mutual mistake of fact as neither court nor counsel were aware of insured's death; that the said judgment as formerly entered was void, and that Pearl Spruce was the duly qualified administratrix of the estate of the insured, and vacated the former judgment, and then and there overruled the Government's motion for judgment as made at close of all the evidence, the government reserving an exception to this ruling, having substituted Pearl Spruce, administratrix, as plaintiff, and revived the action in her name as such and as in the vacated judgment awarded permanent total disability benefits in her favor, exceptions separately being made and allowed to the actions, findings, rulings, decisions and re-entry of the judgment on the part of the court.

An appeal was duly allowed on the re-entered judgment and perfected, it being

stated that the defendant took this action to protect its right to prosecute an appeal on the merits of the case, apprehending the possibility that the second judgment might be held invalid, as entered after an appeal had been taken from the former entered judgment. The government has filed in this court a suggestion of the death of the original plaintiff and a motion that this court order the substitution of Pearl Spruce, administratrix, as appellee in the former appeal, or, in the alternative, that the case be remanded to the district court with instructions to order the substitution.

Prior to his induction into the military service of the United States, Alfonso Spruce, the insured, was a waiter at Trion, Georgia, apparently in good health, although he had had gonorrhea and a sunstroke and had shown some indication of lung trouble. When he reported for mobilization at Camp Gordon in the state of Georgia on June 27, 1918, he was five feet, five inches tall, weighing 136 pounds. His heart, lungs, and other organs were found to be normal, and physically qualified for general military service. Said insurance contract was issued July 15, 1918, the assured being admitted to the hospital at Camp Gordon on December 7, 1919, with a diagnosis of mumps (bilateral). Orchitis and acute bronchitis developed on December 10, 1918, and broncho-pneumonia on December 12, 1918. He remained in the hospital until December 26, 1918, when he was discharged and returned to duty, his condition being considered good, at which time he weighed 150 pounds.

At expiration of his furlough and return, he was readmitted to the hospital on February 21, 1919, for two days' treatment on account of a cold. On February 24, 1919, he again was re-admitted and treated for two weeks for sub-acute bronchitis, and transferred to the infirmary as convalescent on March 10, 1919, returning to duty on March 18, 1919.

Immediately prior to his discharge from the army on March 25, 1919, insured declared in writing that he had no reason to believe that he was suffering from the effects of any wound, injury, or disease, or that he had any disability. Also upon examination by a physician and surgeon immediately prior to his discharge he was found to be physically and mentally sound. After such discharge he went to his sister's home in Rome, Georgia.

Oral and documentary evidence, including statements and affidavits made by the insured, disclosing that he worked regularly in Tennessee and Georgia from April, 1919, to January, 1924, were introduced. Most of the work record thus sought to be proved on the part of the government was denied by the insured in his deposition, such evidence by him being corroborated by that of his wife, Johanna Clark, but it was uncontradicted, however, that he worked as yardman and butler in the spring of 1920 for two months for a Mr. Caperton, followed immediately by a year of similar work for Dr. Mallicoat, receiving $10 or $12, and in addition his board and room, each week, as compensation therefor, and that he did occasional jobs for varying short periods until September, 1923, when he went to work as a waiter at the McCallie School in Chattanooga, continuing there fourteen weeks, working seven days a week, thirteen hours a day, and for which he was paid $12 or $13 a week with room and board furnished.

The insured was also issued a "Life and Accident and Health Policy" by the National Life and Accident Insurance Company of Nashville, Tennessee, at his instance and upon his representations of good health on October 18, 1920. He married in 1921, his wife testifying that he attended parties and other social affairs at which he danced. He divorced his former wife in 1928 or 1929, and thereafter served a term in the Missouri State Penitentiary. He was married again on March 4, 1931.

In his deposition the insured testified that as to his left leg and arm he had become crippled when he had pneumonia in the army and that his back had been affected, and after discharge in March, 1919, he did "pretty well" until he "broke down" in June, 1919, and that thereafter he always had pain in his arm, legs, and back, and at times his legs would fail to support him, and that this affected his ability to work and he would have to quit his jobs and go to bed for relief; that he was not strong enough to plow a garden, and he was unable to stand or walk for any length of time, and he had to use a cane or crutches for support, and that these conditions prevailed from time of his discharge, and that he had "something like a paralytic stroke" on December 31, 1923, and that in 1920 he had night sweats, that being when he filed his claim for compensation, February 3, 1920, and in January and February, and December of 1919, he was sick and had awful bad night sweats and

coughed. He claimed that that was why he filed said claim. This claim for disability compensation on February 3, 1920, was on account of "Rheumatism," he being given in connection therewith many physical examinations. After 1924 he was hospitalized on numerous occasions, the dates of which do not definitely appear, although he was in the hospital at time of trial. He did not offer the testimony of any physician who had examined him, or any other expert evidence.

Dr. G. W. Hall testified for the government that he treated the insured in 1919 and again in 1920 for period of from two to three months, and found acute inflammation of several of the larger joints of the body, making a diagnosis of articular rheumatism; that insured was working as a farm laborer, and in the opinion of the physician as a witness he stated:

"Spruce's rheumatic condition or physical condition at that time was not serious enough to keep him from going about his regular work as a farm laborer. When Spruce got over the acute part of his rheumatism, he was able to do any kind of work that any other negro could do. During the time I was treating him for rheumatism, he did not give any subjective symptoms of any lung involvement—neither did I find any objective symptoms."

The following reports as to various physical examinations of the insured covering the period from February 10, 1920, to January 20, 1936, were introduced by both sides, being summarized and arranged in chronological order, as follows:

"February 10, 1920—General condition fair. Pain on pressure over knees. Slight bronchial cough. Otherwise negative. Diagnosis: Syphilitic rheumatism.

"April 24, 1920—General condition good. Bronchial cough better. Pain on pressure over knees. Otherwise negative. Diagnosis: Syphilitic rheumatism.

"1921–1922—No reports.

"January 31, 1923—General: Fairly well developed and nourished negro man, walking on crutches. Heart and lungs normal. Complains of tenderness in certain muscles of back, and stiffness and tenderness of both knee joints—motion free, no enlargement, other bones and joints negative. Diagnois: Mild chronic arthritis.

"February 2, 1923—X-ray examination of lumbar spine, hip joints, and knees. No pathology of spine, hips, or right knee.

There is no evidence of pathology of the left knee except a slight irregularity on the surface of the internal condyle which is evidently due to a mild form of chronic arthritis.

"February 2, 1923—Orthopedic examination by Dr. J. H. Bevington, Chattanooga, Tennessee—'I cannot find any definite pathology in this man. He comes in on crutches and exaggerates his pain greatly. He may have a mild arthritis of his left knee but I cannot find it.'

"June 15, 1924—Examination and interpretation of X-rays made June 12, 1924: Well developed chest, some peri-bronchial thickening of hilus and first and second interspace trunks of left lung. Similar conditions in right lung but there is no evidence of active disease. Heart enlarged. No bone pathology. Diagnosis: Chronic bronchitis, rheumatism, and cardiac hypertrophy.

"August 15, 1924—Diagnosis: Chronic bronchitis, rheumatism, and cardiac hypertrophy.

"November 12, 1925—X-ray: No pathological changes in parenchyma of the lung tissue and no increase in the peri-bronchial tissue. Irregularity of right diaphragm suggestive of old diaphragmatic pleurisy. Heart and aortic shadows normal. Lower dorsal and lumbar spine and sacroiliac joint negative. Orthopedic Examination: (Coughs occasionally and has night sweats), Spine very flexible. Able to bend with normal curves in various directions. No rigidity of muscles. Deformity: Stands in postural kyphosis and lateral curvature of spine, which disappears on forward bending. No swelling of joints, no atrophy of muscles and no tenderness on pressure. Diagnosis: Postural curvature of spine—kyphosis and lordosis.

"November 12, 1925—Height five feet, six inches. Weight 138 pounds—normal and lowest weight same. Heart normal. (Orthopedic examination, X-ray report and diagnosis set out, supra.) Eye, ear, nose and throat diagnosis: Deviated septum, adherent tonsils. No urinary disease found. Lungs: No evidence of pulmonary disease.

"August 2 and 3, 1926—Diagnosis: Chronic pulmonary tuberculosis, minimal, active.

"September 2, 1926—Weight 146 pounds. Joints and extremities negative. Heart apparently normal in size and posi-

tion, heart sounds of good tone and quality. No disease found in lungs.

"October 15, 1926—Diagnosis: Chronic pulmonary tuberculosis, minimal, active. Remarks: Temperature is the only sign of activity.

"December 10, 1926—Diagnosis: Apparently arrested pulmonary tuberculosis. Knee condition progressively worse: though possibly of tubercular origin it is not tubercular now. Some spinal condition.

"February 17, 1927—No visible deformity of chest or spine. Hip involvement retrogressive, forced to take to crutches two weeks ago. Kyphosis growing painful, brace needed. Lungs coming on toward arrest. Diagnosis: Apparently arrested pulmonary tuberculosis.

"April 21, 1927—Lungs improving, back worse.

"June 28, 1927—Pulmonary tuberculosis approaching arrest.

"August 29, 1927—Lungs quiescent, hips and back not improving.

"October 31, 1927—Chronic pulmonary tuberculosis, minimal, inactive.

"December 27, 1927—Chronic pulmonary tuberculosis, minimal, slightly active in left apex. Brace needed for kyphosis.

"1928-1929—No reports.

"August 22, 1930—Weight 146 pounds, lowest weight over the past year, 140 pounds. Blood pressure low. Mild partial heart block. Has practically lost control of lower extremities. There is a healed tuberculosis involvement of the lower lumbar and sacrum with impingement upon the lumbar and sacral plexuses. Pulmonary tuberculosis, minimal, not active.

"1931-1934—No reports.

"March 6, 1935—January 20, 1936—Apparently in hospital. Diagnosis: Chronic pulmonary tuberculosis, active right upper lobe; moderate, chronic arthritis of left hip; mild arterial hypertension; and chronic tuberculosis bursitis of the left hyperthenar eminence."

Dr. Sam H. Snider, a tuberculosis expert, testified for the government that he examined the insured on August 2, 1926, at Kansas City, Missouri, finding him to be well developed and well nourished, no rales, heart and his chest considered normal. The diagnosis was "no disease found in the lungs." There was no evidence of active pulmonary tuberculosis. Insured had a temperature at the time of 100 degrees but the cause thereof was not stated. Dr. Snider further testified that the rapidity of the development or advancement of tuberculosis was never uniform but varied with different individuals, and under different circumstances, being governed by the virulence of the germ and the resistance of the individual, it being possible for a physical examination to fail to reveal the presence of the disease.

There is no substantial evidence of permanent, total disability prior to April 30, 1919, the date on which protection ceased under the contract of insurance herein sued on. Tuberculosis and general disability, the latter presumably including rheumatism and arthritis, are relied upon. On account of insured's hospitalization in December, 1918, and February and March, 1919, for mumps, bronchopneumonia, and acute bronchitis, detailed records of his condition near the end of the period in question were available. None of the claimed disabilities are revealed. Instead it is disclosed that his physical condition was good after his recovery from the enumerated temporary periods of illness, his weight being considerably more than when he entered military service. At time of his discharge, in writing, he disclaimed any disability.

In his deposition he stated that until he "broke down" in June, 1919, he got along "pretty well." Dr. Hall, who treated him at that time, testified that insured had rheumatism which was not sufficiently severe to interrupt his duties as a farm laborer and that it would not interfere with his activities, except during acute attacks.

On February 3, 1920, insured claimed disability compensation, giving only rheumatism as a basis therefor. In October, 1920, he took out health and life insurance with a commercial concern, then representing that he was in good health.

There is nothing in the evidence up to that time nor in the conditions which subsequently developed on which to base a fair inference that the insured was permanently and totally disabled in April, 1919.

In United States v. Martin, 10 Cir., 80 F.2d 460, the court restated the rule, now sustained by the decided cases, that recovery cannot be had on these policies unless, while the insurance is in force, the insured is afflicted with a disease which not only totally disabled him but from which there was no reasonable prospect of recovery if properly treated.

See, also, United States v. Rentfrow, 10 Cir., 60 F.2d 488; United States v. Spaulding, 293 U.S. 498, 504, 505, 55 S.Ct. 273, 79 L.Ed. 617, rehearing denied 294 U.S. 731, 55 S.Ct. 504, 79 L.Ed. 1261, and Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

The first diagnosis of pulmonary tuberculosis was made on August 2, 1926, at which time it was considered minimal.

In United States v. Sandifer, 5 Cir., 76 F.2d 551, 554, which is cited with approval by this court in United States v. West, 10 Cir., 78 F.2d 785, 786, it is said:

"Because we think it clear that plaintiff failed to show the first essential of recovery, the onset of this disablement, permanently and totally disabling him while his policy was in force, and it is therefore immaterial whether he since became so, it will serve no purpose to set this evidence out more fully. *Without medical testimony that he was at all disabled when he left the army; without any as to when the tuberculosis, which the examination in the spring of 1921 disclosed, first made its onset in disabling form; without any as to what it was he was suffering from before 1921,* as told by his brother, his neighbor and himself, it cannot be said that plaintiff's case was made out. * * * Plaintiff could not sustain his claim by showing that the condition he now claims as permanent might have arisen while his policy was in force. He must show that it did." (Italics supplied.)

Of like import and applicability is the per curiam opinion in United States v. Baker, 4 Cir., 73 F.2d 455, wherein it is said [page 456]:

"The premiums paid kept the insurance in force till July 1, 1919. Insured died May 13, 1921, of miliary tuberculosis, or galloping consumption. Although there is evidence of symptoms which might have justified a finding that the insured had incipient tuberculosis at the time of the lapse of the policy, there is no evidence that at that time the disease was of such a character or had reached such a stage that it could not have been arrested by proper treatment. On the contrary, it appears * * * that not until September, 1920, was his condition such as to cause him to seek medical advice. * * * and not until February, 1921, was he found to have tuberculosis."

See, also, Grate v. United States, 8 Cir., 72 F.2d 1, certiorari denied 294 U.S. 706, 55 S.Ct. 352, 79 L.Ed. 1241; United States v. Stack, 4 Cir., 62 F.2d 1056; United States v. McShane, 10 Cir., 70 F.2d 991, certiorari denied 293 U.S. 610, 55 S.Ct. 141, 79 L.Ed. 700; Carey v. United States, 10 Cir., 69 F.2d 766; Nicolay v. United States, 10 Cir., 51 F.2d 170; United States v. Rentfrow, supra; Rentfrow v. United States, 10 Cir., 67 F.2d 747; Hirt v. United States, 10 Cir., 56 F.2d 80, and Roberts v. United States, 10 Cir., 57 F.2d 514, and Falbo v. United States, 9 Cir., 64 F.2d 948.

The first diagnosis of rheumatism was made in June, 1919, and of arthritis on January 31, 1923, at which time same was considered mild. No expert witnesses testified that insured's rheumatism and arthritis were permanently and totally disabling, and it is generally recognized that they do not necessarily constitute permanent total disability. Proechel v. United States, 8 Cir., 59 F.2d 648; United States v. Hill, 8 Cir., 62 F.2d 1022; United States v. Lemore, 2 Cir., 89 F.2d 6; Tracy v. United States, 2 Cir., 68 F.2d 834; United States v. Hall, 1 Cir., 86 F.2d 537, 538; United States v. Becker, 7 Cir., 86 F.2d 818; Unglaub v. United States, 7 Cir., 57 F.2d 650, and Hughes v. United States, 10 Cir., 83 F.2d 76.

The defendant's motion for judgment in its favor should have been sustained.

It is not essential to determine whether the death of the plaintiff before the first judgment was entered and the proceedings on appeal therefrom void, and whether the re-entry of the second judgment was permissible, as it would be necessary to reverse the case in any event on account of the insufficiency of the evidence to support either the first or second judgment.

The case is reversed and remanded with directions to grant a new trial.