## INDEMNITY INS. CO. OF NORTH AMERICA v. ATCHISON, T. & S. F. RY. CO.*

### No. 8064.

Circuit Court of Appeals, Ninth Circuit.

Aug. 17, 1936.

*For opinion on rehearing, see 85 F.(2d) 1006.

Silverthorne & Van Spanckeren, of Phœnix, Ariz., and S. J. Grogan, of Los Angeles, Cal., for appellant.

Chalmers, Fennemore & Nairn, of Phœnix, Ariz., and Norris & Patterson, of Prescott, Ariz., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

DENMAN, Circuit Judge.

Appellant, plaintiff below, appeals from a judgment based upon a verdict instructed for defendant railway company. Appellant, under a bond given by it to one M. H. Slocum, became subrogated to and assignee of Slocum's claim for damage to steel girders, I beams, and other steel transported by the railway company and alleged to have been damaged by the railway company's negligent operation of its locomotive crane in dropping one of the girders on a pile of other girders on the ground, while unloading them from the railway's flat cars.

The railway company's answer denies that it was operating the crane in question, and alleges that Slocum hired the crane and employed the crane operator. It further alleges that the unloading occurred in the delivery of the girders as a part of an interstate carriage to the place of delivery, and since, as an interstate carrier, it was prohibited from unloading the girders by a regulation, Rule 27, § 1, of the official classification of the Interstate Commerce Commission, the unloading must be regarded as performed by the consignee.

The question whether or not the evidence was such as to warrant an instructed verdict for the defendant railway company is controlled by the decision of the Supreme Court in Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 78 L.Ed. 492, in which it held as follows: "The question presented is whether there was any evidence upon which a verdict for petitioner might properly be found. And, for its decision, we assume as established all the facts that the evidence supporting petitioner's claims reasonably tends to prove, and that there should be drawn in his favor all the inferences fairly deducible from such facts. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720."

The evidence is uncontradicted that the bill of lading provided for a carriage from Roanoke, Va., over connecting lines and that of the appellee railway, to Seligman, Ariz.; that, when the girders and other steel arrived in the yard of the railway company at Seligman, they were receipted for by Slocum as delivered to him on December 12, 1930; that this delivery on the cars is the delivery contemplated by the Interstate Commerce Commission's rules, as ending the interstate transport; that, instead of being unloaded in a safe place to the ground in the railway company's yards, they were, three days later, on December 15, 1930, started in a series of successive transports back and forth between the town of Seligman and a railroad bridge a mile out of Seligman over which the railway's main line double tracks ran; that 30 regular daily trains, averaging one every 48 minutes, ran over this bridge, successively interrupting the occupancy of one of its tracks; that this bridge was across an arroyo or wash and that the girders were intended for a highway bridge across the same wash, some distance to the southerly; that a locomotive crane furnished by the railway was transported back and forth from Seligman to the bridge, and from time to time rested on one of the main line tracks on the bridge; similarly the flat cars carrying the girders were transported back and forth to rest now and then on the other main line track; that the girders were 72 feet long, and hence very heavy; that in the process of partial unloading on each of these transports to the

bridge the cable from the crane boom was attached to the girder on the car on the adjoining track, and lifted it by the crane engine power in the air across the bridge from that track, thereby crossing the track and bridge structure on which rested the car of which the crane was a part, and then carried clear of the bridge and lowered toward the ground to a position signaled by one of Slocum's crew; that the average 48-minute frequency of interruption of unloading and of the transport of the cars and crane on the two tracks, or either, back to Seligman, could have left not over 30 minutes average time on the bridge for the crane operation.

It is hence a rational inference that any mishap causing the dropping of one of the heavy girders on the bridge might well tie up the main line daily 30-train transportation of the railway. From this it is also a reasonable inference that the operation of the crane should be determined by the safety and convenience of the main line travel and that its operator should not have had suspended in the air one of the heavy girders at the time of approach of any of the 30 trains daily using the tracks in the general operation of the railway.

It is obvious that these unusual successive shunting transportations back and forth from the bridge to Seligman, the cars resting now and then on the bridge as one terminal, with an independent engine and crew and safety men to watch out for the regular trains, a transport and delivery which occupied and blocked *both* the main line tracks, are essentially new and different from the interstate transport of the flat cars as a part of a train moving on one track in one direction from Virginia to the delivery yard in Seligman.

There is also evidence from which the jury might have inferred that injury to the steel was caused by the negligence of the crane operator.

With this general view of the admitted process involved in the unloading of the girders, and the evidence from which the crane operator's negligence may be inferred, the first problem to be solved is whether there is any evidence from which the jury might have inferred that the railway rather than Slocum operated the crane in unloading the girders.

Slocum agreed to pay the railway the following three items for its services after the delivery of the steel in Seligman: (1)

The wages of the train crews in shunting the cars between Seligman and the bridge and of the crane operator; (2) the other costs of train and crane operation; and (3) a daily amount for the time the crane was employed. Obviously, the jury could infer that, by paying these items of cost, Slocum did not become employer of the train crews, or principal in that portion of the process incidental to unloading which consisted in the movement of the train and crane on the bridge to avoid the regular train service over it. It seems difficult to apprehend what other inference could be drawn.

The railway company picks out from all these items the crane rental and its operator's wages as payment for the rental of the crane to Slocum *for his independent operation* and payment *through* the railway company of the wages of the crane's operator as Slocum's servant. Slocum claims that the whole transaction of transporting to and from the bridge and unloading was a single enterprise conducted by the railway, and that the crane operator was one of its general employees along with the many others necessary to transport and deliver the girders and other steel on the ground alongside the bridge.

We hold that the jury might properly have inferred from the evidence that the crane operator was the employee of the railway and not of Slocum. The steel was on its way from Virginia to Arizona on a bill of lading to Seligman, when the negotiations for its new and different transport to and from and unloading at the bridge were conducted by Slocum and the railway's Division Superintendent Simpson. Slocum's testimony, warranting the inference that the crane operator was in the employ of the railway when the injury occurred, is as follows:

"Mr. Simpson told me that they would have a crane that had been doing some other work on the Santa Fé in there, and that they were going to take it to the shop at San Bernardino, and that they would unload it—they would let the crane stay there and unload that steel. At the time I talked to him he explained to me that we could not operate this crane ourselves as it was on the Santa Fé main line and that there would have to be a train crew and their crane operator and everybody connected with the crane would have to be railroad men, and that we couldn't go down there and handle it. I objected to it at the time because I

said I can get that done for a lot less money if we operate it ourselves. He said, 'I can't help it. You know you can't go out on any railroad main line with equipment of any kind and operate it yourself. You would have to have a pilot and flagman and crews that were acceptable to the railroad and everything else.' And I said 'O. K., well, just go ahead and you push the steel down there with your own crews and handle it with the crane and we will take it when it gets on the ground,' and he said 'all right.' * * *

"In accordance with my understanding with Mr. Simpson, as to who was to have charge of the operation of the unloading of the steel, the Santa Fé was to go out and pick the steel up. We had two men there that were to get on the car and put the slings around the girders and then the Santa Fé crane operator picked the stuff up and set it on the ground at which there were two men waiting on the ground to unhook the slings and then they went back and got the next girder. * * *

"The arrangements I made for the cost of that service at that time were that we were to pay the standard railroad rates for whatever crews were on the crane and train crew to operate it. * * * We were to pay for the time when those crews were called until they were through.~ By this, I mean, they might be down on the spot for two hours unloading but they would be called for that day, and if they worked for two hours in the forenoon and two hours in the afternoon we had to pay for that crews' day because they were called, and I can't remember now what those rates were, but the rental on the crane itself without the crew which we paid for as labor, was, as I remember, $50.00 for an 8-hour shift and we paid for labor and everything above that."

The situation is identical with that in Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 255, 53 L.Ed. 480, in which the shipowner was held the employer of its winchman, operating the ship's winch in cooperation with the employees of a stevedore company which had contracted to unload the shipowner's cargo.

"The winchman was, undoubtedly, in the general employ of the defendant [Standard Oil Company], who selected·him, paid his wages, and had the right to discharge him for incompetency, misconduct, or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant it must appear that that relation, for the time, had been suspended, and a new like relation between the winchman and the stevedore had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum, and the winchman were its own. It did not furnish them, but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control. * * * The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, and is not enough to show that there has been a change of masters." Standard Oil Co. v. Anderson, supra, 212 U.S. 215, 225, 29 S.Ct. 252, 53 L.Ed. 480.

There the shipowner's winch corresponded to the crane here. The winch operator corresponded to the crane operator. A stevedore company contracted to unload cargo. Its men lashed the winch cable to the cargo, the winch operator raised it from the hold and swung it across the deck to the wharf and then lowered it. The Supreme Court held that the winch operator was the employee of the shipowner, and that the stevedore company was not liable for his negligence. The fact that the cargo, the passive object of the causative power and operation of the winch, belonged to the shipowner, while the steel here belonged to Slocum, makes no difference in the corresponding causal chain leading to the injury. Nor is there any distinction in the fact that the stevedore company did not pay the winchman's wage, while Slocum paid to the railway company a sum equal to the crane operator's wage and that of all other employees in transporting to and delivering the steel at the bridge. Here was ground for an inference by the jury that the pay to the crane operator did not indicate that he had any different relation to the railway company than that of the train crew, admittedly the railway's employees.

■ The railway contends that the unloading of the girders *must* be regarded as having been performed by the consignee appellant

because of the following rules established by the Interstate Commerce Commission:

"Consolidated Freight Classification No. 6.

"(Western Classification No. 61)

"Applies on freight traffic *covered by tariffs* issued subject to the Western Classification, as such tariffs may provide. * * *

"Rule 27.

"Loading and unloading C. L. Freight.

"Section 1. Owners are required to load into or on cars freight for forwarding by rail carriers, and to unload from cars freight received by rail carriers, *carried at carload ratings.*" (Italics supplied.)

The evidence is uncontradicted that the carriages back and forth from Seligman to the bridge were not under the "tariffs issued subject to the Western Classification" or at the interstate "carload ratings," but were on a new and entirely separate and unusual compensation for the special and intricate service between Seligman and the bridge. By its own terms rule 27, relied upon by the railway and in the dissent, is not applicable to the carriage after arrival at Seligman.

The District Court relied on Rockwell v. Grand Trunk Western R. Co., 264 Mich. 626, 250 N.W. 515, in which steel I beams were negligently unloaded in the delivery yard at the end of an interstate carriage. There was no unusual intermittent series of transportations back and forth to a new and unusual point of consignment for which the railway was paid a separate compensation based upon this new service. The consignee made no payment to the railway company for the use of its crane in its yard. The court held that Interstate Commerce Commission rule 27 applied. This required consignees in such interstate shipments to unload their freight themselves, thus, in effect, preventing rebating by a free unloading by the railroad.

It is unnecessary to decide whether the case here is distinguishable from the Rockwell Case by the fact that the consignee here paid the railway its cost for the several transports and use of the train and crane crew. Here was evidence from which the jury could infer that the steel was not unloaded at the terminus of an interstate shipment. The steel was receipted for to the railway on the railway's printed form as delivered to Slocum while on the cars in the Seligman yard on December 12, 1930. The agreement to carry it in the unusual suc-

cessive transports to and from the bridge was negotiated after the bill of lading contract for shipment *to* Seligman had been entered into and was partially performed. The performance of the agreement for the transports to and from the bridge began three days after the fulfillment of the bill of lading obligation. From these facts at least the jury was entitled to infer and, arguably, the appellant was entitled to an instruction, that the unloading of the steel was at the end of an independent intrastate transportation and that Interstate Commerce Commission rule 27 did not apply.

The error in the railway's position and, as we understand it, of the dissenting opinion, is its basic assumption that an interstate shipment can never end by delivery to the consignee on the carrier's cars. The dissent states this as follows: "The interstate contract of carriage was not completed until the cars were unloaded." Although, as here, under its regular printed form, the consignee receipted to the carrier for a completion of its interstate bill of lading obligation, nevertheless the carrier is still carrying in interstate carriage, until the consignee has lifted the girders off its cars on to the ground. If this be so, the railway would still be carrying in interstate commerce, though a consignee hooked on his own locomotive and pulled the cars on his own track to his own plant, say, five miles distant from the railway's yard.

The railway's argument and the conclusions of the dissent seem grounded on the fear of a possible preference one consignee may be given over another in unloading. In making such an application of the rule to this case, the extraordinary favor to the shipper of all these complicated arrangements of the trips to and from the bridge is deemed a part of the interstate carriage *preceding* delivery. With this we cannot agree; we hold that there is evidence from which the jury might have inferred that the railway corporation, whether as an agent or as an independent contractor, was negligent in the performance of an obligation to the appellant.

There should be a new trial.

Reversed.

WILBUR, Circuit Judge (dissenting).

I dissent. Section 1, rule 27, of the Interstate Commerce Commission, referred to in the main opinion, is as follows: "Owners are required to load into or on cars freight for forwarding by rail carriers, and to un-

load from cars freight received by rail carriers at carload ratings."

Under this rule the bill of lading required the owner to unload the steel girders. The contract between the railway company and the owner entered into during the progress of the interstate carriage must be read in the light of the obligation thereby imposed upon the owner to unload the cars. The interstate contract of carriage was not completed until the cars were unloaded. In my opinion, the short haul to the point where the I beams were unloaded did not constitute a new intrastate commerce transportation entirely distinct from the original contract of carriage such that the interstate commerce rule no longer applied. This additional haulage was evidently contemplated by the parties in connection with the interstate carriage, and the unloading was considered by them as that required to be performed by the owner at the conclusion of the interstate shipment.

The contract with reference to unloading must be viewed in the light of the fact that the unloading was the work of the owner and not of the carrier. The question arises as to whether the railway company assumed the burden of doing the work of the owner for compensation, or whether both parties recognized the legal obligation on the part of the owner to unload the cars and the railway company loaned its equipment and employees for that purpose for an agreed compensation. The trial court based its conclusion on Rockwell v. Grand Trunk Western R. Co., 264 Mich. 626, 250 N.W. 515, decided by the Supreme Court of Michigan. In that case a similar arrangement between the carrier and the railroad company for unloading of I beams for a bridge, in view of rule 27 I. C. C., was held to make the crane operator an employee of the owner for the time being. I think the decision is correct and should be followed.

The Supreme Court of Pennsylvania reached a similar conclusion in Rau v. Wilkes-Barre & E. R. Co., 311 Pa. 510, 167 A. 230, where the railroad company also furnished a crane for the unloading of a carload shipment of stone. The conclusion of the court was based upon the tariff regulation requiring the consignee to unload the car and upon the presumption that in making their arrangement with reference to unloading they intended to act unlawfully.

The opinion of the majority would leave to the jury the question of whether or not the unloading of the cars in question was

at the end of an interstate or intrastate transportation. As the facts are undisputed in my opinion this question was one for the court, and the jury should be definitely instructed upon that question as a matter of law, if the case is to be retried.

The authorities cited by the parties on the question of the termination of the interstate journey, with the exception of Rockwell v. Grand Trunk R. Co., supra, are not directly in point. In one of the cases appellee cites, Pitman v. Yazoo & M. V. Ry., 171 Miss. 799, 158 So. 547, an employee of a consignor loading lumber upon flat cars of the carrier was held to be the servant of the owner and not of the carrier and that the Interstate Commerce Act applied because the loading was a part of interstate transportation. By parity of reasoning the appellee claims that the interstate journey in the case at bar was not completed until the girders reached the ground.

The question of when a servant of a railroad company becomes temporarily the servant of another was recently discussed by the Supreme Court in Denton v. Yazoo & M. V. Ry. Co., 284 U.S. 305, 52 S.Ct. 141, 142, 76 L.Ed. 310. It is emphasized there that the question for determination in these cases is, "Whose is the work and whose is the power of control"? If, in the case at bar, the obligation imposed by rule 27 of the Interstate Commerce Commission was still binding upon the consignee, as I think it was, then it is clear that the work was the work of the consignee and not of the railroad company. The unloading was to be supervised by the consignee, who thus had the power of control so far as the actual unloading is concerned, although that control was subject to the railroad company's control of the movement of the train to and from the place of unloading and of the time of unloading. There is no doubt, as the majority holds, that the case of Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, cited by appellant, is closely analogous, but, as pointed out in the case of Denton v. Yazoo & M. V. Ry. Co., supra, it was there determined that the company furnished the work done by the winchman and did not furnish the winchman to the stevedore. We quote the comment of the Supreme Court in the Denton Case upon the Anderson Case as follows: "This court held upon the facts, in the light of the rule which we have just stated and discussed, that the power, the winch, and the winchman were those of the company, and that the company did not furnish them, but furnished the

444

work they did to the stevedore; and that this work was done by the company as its own work, by its own instrumentalities and servant under its control. A judgment for Anderson against the company was affirmed."

In the case at bar the controlling consideration is the effect of rule 27 which makes the unloading the work of the consignee and not of the railroad company. It is true that the railroad company and the consignee might make a contract in direct violation of the law or that the contract made for compensation might be valid, but in either event it is essential to recognize that the work done, unless clearly indicated otherwise by the special agreement, is the work of the consignee. In the case of Denton₁ v. Yazoo & M. V. Ry. Co., supra, the Supreme Court was largely influenced in reaching its conclusion ⸗that a railway porter named Hunter who was assisting with the unloading of the mail was the servant of the government and not of the railway company, because of the fact that the work being done was that of the government. The court there stated: "Whether the railroad companies may be held liable for Hunter's act depends not upon the fact that he was their servant generally, but upon whether the work which he was doing at the time was their work or that of another; a question determined, usually at least, by ascertaining under whose authority and command the work was being done."

On the whole, however, my opinion is that the trial court correctly instructed the jury to return a verdict for the defendant because under the admitted and undisputed facts there was no evidence to sustain the conclusion that the trainman was acting on behalf of the railroad company instead of on behalf of the consignee.