### GLICK v. UNITED STATES.
### No. 6130.

Circuit Court of Appeals, Seventh Circuit.
Dec. 10, 1937.

Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett and Fendall Marbury, Sp. Assts. to Atty. Gen., and Arthur Roe, U. S. Atty., of Danville, Ill., for the United States.

Samuel V. Jinkins, of Danville, Ill., and Eugene Bland, of Shelbyville, Ill., for appellee,

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

**EVANS, Circuit Judge.**

Two questions are presented by this appeal. One deals with a fact inquiry, the other is one of law. Does the evidence support the finding that plaintiff was totally and permanently disabled either in April, 1919, or in May, 1922? Is there a valid bill of exceptions?

Plaintiff entered the service, April 30, 1918 and was honorably discharged April 15, 1919. This action was begun June 25, 1932. He paid no premiums after his discharge. During service, premiums were deducted from his pay.

In his original complaint he alleged that he became totally and permanently disabled November 3, 1918, as a result of the following ailments: "Gassed, pulmonary tuberculosis, asthma, pleurisy, lung trouble, heart trouble, endocarditis, myocarditis,

shortness of breath, nervousness, stomach trouble, intestinal trouble, ear trouble, trench feet, varicose veins, general weakness, exhaustion and general disability, and other diseases unknown to the Plaintiff."

His claim was disallowed by the United States Veterans' Bureau. After this action was begun, plaintiff amended his complaint and alleged that the insurance remained in force until May 1, 1922, by reason of the fact that compensation was due him from the Government in an amount sufficient to keep the insurance in force until May 1, 1922; that he became totally and permanently disabled on the first day of April, 1922.

Defendant objected to the amendment on the ground that it involved a claim never presented to the United States Veterans' Bureau. Only a total and permanent disability as of November 3, 1918, was before the Bureau. The objection was overruled and a trial by the court, without a jury, resulted in favor of plaintiff. Defendant appealed.

Plaintiff questions the bill of exceptions because not settled in time. The court granted extensions of time and these orders were made a part of the record, but they are not incorporated in the bill of exceptions; hence plaintiff's urge.

In other words, the appeal was taken April 4, 1936. The bill of exceptions was settled on January 2, 1937. Several extensions of time within which to settle the bill of exceptions were made by the court, but they were not incorporated in the bill of exceptions.

The clerk has certified all the orders extending the time as demanded by the praecipe. Defendant argues that these orders are part of the common law record. Plaintiff denies it. Thus is the issue raised. No objection was made to the court's approving the bill of exceptions or to the failure of defendant to incorporate orders extending time therein.

■ On this question we have an interesting and unique situation arising out of the granting in one case, and the refusal in another to grant certiorari by the Supreme Court. Ordinarily the refusal to grant certiorari creates no inference. Atlantic Coast Line R. Co. v. Powe, 283 U.S. 401, 51 S.Ct. 498, 75 L.Ed 1142. Here, however, the facts are distinguishing. Two Circuit Courts of Appeals (La Grotta v. United States, 77 F.2d 673, 103 A.L.R. 527, Eighth

Circuit and United States v. Payne, 72 F. 2d 593, Ninth Circuit) reached opposite conclusions with respect to the necessity of making an order extending the time to present the bill of exceptions a part of the said bill. They were announced about the same time. The Supreme Court granted certiorari in Payne v. United States (Ninth Circuit case), 295 U.S. 722, 55 S. Ct. 642, 79 L.Ed. 1675, where the court refused to recognize the validity of the bill of exceptions. It refused certiorari in La Grotta v. United States (C.C.A.) 77 F.2d 673, Eighth Circuit case (Quigley v. U. S., 296 U.S. 629, 56 S.Ct. 152, 80 L.Ed. 447), where the court recognized the validity of the bill of exceptions notwithstanding the orders extending the time for its settlement were not made a part of the bill of exceptions.

Unfortunately the question, which was on its road to final determination, remains unanswered by the Supreme Court because the parties to the suit where certiorari was granted settled their controversy and caused the certiorari to be dismissed (Payne v. U. S., 296 U.S. 659, 56 S.Ct. 87, 80 L.Ed. 469). An interesting discussion on settling bills of exceptions in criminal cases appears in the opinion in Forte v. U. S., 58 S.Ct. 180, 82 L.Ed. ——, announced December 6, 1937.

■ We may accept without question and without the citation of authorities a few basic propositions of law. Without a valid bill of exceptions we cannot review the finding on the issue of fact which is at the bottom of the judgment from which this appeal was taken. A court is not authorized to settle a bill of exceptions after the term and after the time fixed by its order have expired. Equally clear is the authority of the court to extend the time for settling the bill of exceptions if the court's order is made within the time fixed by its first order. Additional extensions, if seasonably applied for, may also be granted by the court during the life of any previous order.

■ In the case at bar the orders which were entered show on their face they were all properly made. The court was, of necessity, aware of the written orders it had entered. Its authority to settle the bill of exceptions was therefore clear. The existence of that authority was not in fact dependent upon the inclusion of the order in the bill of exceptions. If the court's authority were gone, had expired, the location

of a void order in the bill of exceptions or in the record would not supply that authority. Likewise, if the court at the time it signed the bill of exceptions had the authority to settle it, it was not defeated by failure to incorporate its orders extending time within the bill of exceptions.

In other words, authority or absence of authority in the trial court does not in any way depend upon an appeal being taken.

Counsel's attack is not, or at least cannot be, successfully directed to the court's authority. If he is to prevail, his attack must be predicated on the failure of the bill of exceptions to disclose the authority of the court to settle the bill of exceptions at a date after the term has expired.

In the certificate to the bill of exceptions, the District Judge says:

"And forasmuch as the matters above set forth do not fully appear of record the defendant tenders this its Bill of Exceptions * * *."

Defendant's counsel argues that the orders in question do fully appear of record and therefore were not properly included in a bill of exceptions. They were properly included by the clerk in his return because of the praecipe.

With defendant's position, we agree. The orders were a part of the common law record, and, as such, were properly certified to this court by the clerk. It was not necessary to make them a part of the bill of exceptions. This conclusion is strengthened by the action of the Supreme Court in granting certiorari in the Payne Case and refusing it in the La Grotta Case.

Coming to the merits of the case we find little justification for an extended recital of the evidence, yet are unable to dispose of the single fact issue with satisfactory brevity.

The words "total and permanent disability" have a well understood meaning. They have been widely construed and applied in insurance law.[1]

The following facts carry their own persuasive implications. Plaintiff was discharged April 15, 1919, about one year after his enlistment. He brought this action thirteen years later. In his original declaration he states he was permanently and totally disabled in November, 1918. Some three years later he made sworn complaint that he became totally and permanently disabled, April 1, 1922.

He made no claim of disability of any kind when he was discharged. Nor did anyone who knew him or who was interested in him assert the existence of a disability.

His assertion of permanent and total disability thirteen years later was made only after the Government had discontinued his "adjusted compensation" which had been paid in varying amounts for years. Two years after he filed this suit he made a written statement to the Government investigator wherein he stated that he "drew compensation for disability up to one year ago when same was suspended." From his testimony and this statement it appears that he received his first compensation at the rate of $8 per month about a year after his discharge; this was later increased to $42.-30 a month and after several years his rating was reduced to $12.00, which amount was still later increased to $18.00 per month. When the compensation ceased he sought legal assistance and met one J. who contacted him with an attorney into whose hand he placed his claim and to whom he gave a power of attorney. Application was also made for him to litigate as a pauper.

His claim was rejected. It was then that he stated,

"I have made application for compensation and if I am allowed anything like a liberal compensation I would be willing to withdraw my suit for collection of my war risk insurance. I do not have any idea I will obtain a judgment as I do not claim to be totally and permanently disabled as I have worked when I was able to obtain work since my discharge. I will decide about dismissing my suit for the insurance when my application for compensation has been acted upon."

Although he could read, and he signed this statement, he denied knowledge of the contents of the paper he signed.

When he entered the service he was about thirty-two years of age and weighed about 135 pounds and had no disabilities.

---

[1] Cooley's Briefs on Insurance, volume 6, pages 5536, 5555; Corrigan v. U. S. (C.C.A.) 82 F.2d 106; U. S. v. Frost (C. C.A.) 82 F.2d 152; Miller v. U. S., 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977; Ruling Case Law, Insurance, § 491, & Supplements; Notes in 24 A.L.R. 205; 51 A.L.R. 1048; 79 A.L.R. 857; 98 A.L. R. 788; Lumbra v. U. S., 290 U.S. 551, 559, 54 S.Ct. 272, 275, 78 L.Ed. 492.

He was in France for a few months and in the trenches a short time, about two months. He was hospitalized November 7, 1918. The report reads, "pain and tenderness in anterior portion of plantar surfaces of feet. Very tender. This followed exposure to mud and water in trenches." On November 15, he was reported "up and able to walk around." His condition was "good." Other records show he was in a convalescence camp, being there for trench feet. Admitted November 7, the diagnosis was trench feet, which were improved during hospitalization. Clinical record was made of him which showed he was put to bed and the next day was up and about. The only record of affliction was trench feet.

There are some twenty reports of physical examinations made by the Government since 1920, which might be divided into four classes. They were made at different times from 1920 to 1931. There were X-ray examinations, laboratory tests, subjective and objective examinations. Not one of them disclosed total *or* permanent disability.

As illustrations,—His examination of July 30, 1931 showed "heart action is accelerated. There is no irregularities before or after exercise. No murmurs." "There is moderate * * * enlargement of veins inner and outer side of both legs. * * * Glands: There are palpable inguinal anillary glands, bilateral. * * * Few white blood cells—urinalysis." The diagnosis was reported to be "tuberculosis pulmonary chr. Mimimal, Inactive, Bronchitis Chronic (Mild). Prognosis: Favorable." The neuropsychiatric examination reported a "sad looking melancholy emaciated white male, who dwells constantly on his bodily ailments, is self-centered and suggestible. He gave up all hopes of getting better and is at present applying for permanent and total disability because 'he can't work.' In fact he will compromise on $30.00 per month, on which to get along. He has an asthenic, fatigued appearance. * * * is interested in Examiner's report and tried to read it."

Five doctors testified orally on the trial. Plaintiff offered one who stated he had not seen the patient before the winter of '25-'26 at which time he did not believe "he could engage in physical manual labor." He did not examine the sputum nor X-ray the patient either in 1925, or in 1931, the second time he professionally treated the plaintiff. Patient was not running any fever in 1931 but in 1926 he was.

Four Government doctors examined him. Elaborate examinations and reports were made. They described him as self-centered, discouraged, anxious to be reinstated in compensation payments. They opined that it would improve his general health physically and also his state of mind and make him self-supporting and self-reliant and less centered on his own complaints and ailments if he engaged in some occupation. One described him "as an inadequate personality which is a constitutional and congenital defect." An X-ray specialist examined his heart and lungs in November, 1930, and found "lungs are normal with the exception of slight marking which would indicate a mild bronchitis."

Another physician, a specialist in lungs examined him on July 1, 1931, and found mimimal tuberculosis lesions not active and chronic bronchitis, mild. The X-ray pictures "showed no evidence of tuberculosis." It would not have harmed the plaintiff to "have engaged in some physical activity or occupation." Still another Government physician testified that he examined the patient in 1922 and made a report. His temperature was 98.6 and his pulse 130 and weight, 125 pounds. The diagnosis was chronic myocarditis. " * * * from the report before me, * * * I believed the claimant was able to resume his pre-war occupation to a certain extent. * * * I believe he could do most any kind of work that did not require excessive exertion. * * * My opinion at that time and is now that he could engage in occupations not requiring lifting or climbing and very little exertion."

These examinations were made some ten to twelve years after the plaintiff's discharge from the army. Without quoting at length from the testimony, it is sufficient to say that he was better in 1919 than he was in 1931. At least he worked some and his complaints were less and included a fewer number of afflictions.

Two lay witnesses, only, testified and they confirmed the impression that plaintiff's incapacity was only partial. Fitterer stated that he employed plaintiff from 1921 to 1925 when he sold out his machine shop. He had lost the record of plaintiff's employment but paid him fifty cents an hour at the start and forty cents later because he was not able to do the work. He did

not work constantly. The witness paid skilled labor at the time seventy-five cents an hour. The plaintiff's pay averaged from forty cents to $3.20 a week. His work consisted of putting the material in the lathe and setting it and turning it down. A witness, Bosse, stated that he bought the machine shop in 1925 and the plaintiff ran the lathe for him. He was paid fifty cents an hour. No record was kept. He earned from $1 to $4 per week, and it might have exceeded $5 at times. He worked on and off from 1926 to 1930 or 1931. ·

Plaintiff fails to distinguish between the right to recover on an insurance policy which has lapsed for failure to pay premiums and his right to disability compensation the amount of which depends upon the Government's rating of his disability. There is no relationship between the amounts allowed as adjusted compensation and amounts recoverable on an insurance policy. The latter depends upon the terms of the policy and its enforceability at the time action is brought on it. The former depends upon legislation and Congressional action turns on numerous factors which do not exist in the case of the contractual obligations growing out of an insurance policy, the life of which depends on the payment of premiums.

■ It is important, and in fact essential, to bear in mind that we are here considering grounds for the veteran's nonpayment of insurance premiums—nothing else. Payments of premiums are excused or waived if at the time they are due and not paid the insured is *totally and permanently disabled*.

■ Failure to pay insurance premiums results ordinarily in the termination of the insurance. Subsequent disability, even though complete and permanent, does not revive defaulted insurance. The insured must therefore show total and permanent disability at the date of his default if he is to avoid the effect of his default. In this case the default occurred in April, 1919, and continued to date. If we assume that the insured had some adjusted compensation due him which, if applied on his insurance premiums, would have kept his insurance alive until May, 1922, he must still show that he was totally and permanently disabled from May, 1922, until June, 1932, the date when this action was brought.

■ · In reaching our conclusion we readily and fully recognize the effect of the trial court's finding on this issue. We have no inclination to disturb any finding on a fact issue over which there is a controversy. We are not permitted so to do. In fact, our observation is that appellate courts are inclined to accept findings almost too readily when there exists only an assertion of a fact controversy to support the verdict or finding. Our inability to affirm arises out of our inability to accept plaintiff's loose and nondefinable construction of the term "total and permanent disability."

Of necessity, that term is not capable of exact definition or of application with mathematical exactitude.

It must be conceded that it is possible that a veteran might be discharged without reporting any affliction, or ailment when in fact he was totally and permanently disabled. We believe it would be a rare case. Nevertheless, the possibility of such an instance must be conceded. In the instant case, however, that possibility is reduced to the infinitesimal, in view of the evidence which is at hand showing plaintiff's condition while in France and shortly before he returned to the United States. He says in 1932 he was totally and permanently disabled in November, 1918. In April, 1919, he failed to assert any such disability. The doctor failed to find any ailment. His friends and comrades were unaware of any disability. ·

In November, 1918, he was in a hospital in France, receiving medical attention. His only affliction was tender feet which resulted from too much contact with mud and water, in the trenches. At that time he made no other disability claim and the physicians found none. A few months later when about to be discharged from service he signed a statement not asserting a single disability.

His 1932 assertion of disabilities existing November 3, 1918 does not add strength to his case. The large number of ailments suggests inaccuracy or extravagance of statement. He included too many afflictions; their existence was not established. All of them, with the exception of trench feet and varicose veins, failed of proof.

■ Accepting the testimony most favorable to him and assuming his condition in 1931 or 1932 was the same as in 1919, we are still unable to find a state of total and permanent disability. Findings must be based upon facts. Sympathy may be the basis of compensation to the soldier espe-

cially in cases where there is mental weakness. Certainly our sympathies are quickly and thoroughly aroused if the veteran be one to whom nature has not been generous, where limitations congenital in their origin appear. It is also true that a mental state or attitude resulting from long discouragement and a congenital lack of ambition may be about as real as physical defects. They may be possibly as persuasive in determining total and permanent disability as paralysis or total loss of mind. Nevertheless, in a fact issue involving an excuse for non-payment of premiums existing for a period of thirteen years prior to its assertion, we must look not to the date when the discouragement and lack of ambition ripened into a confirmed mental attitude, but to the date when the first non-payment of premium occurred, that is, before lack of ambition and initiative became chronic and seemingly permanent. Miller v. U. S., 294 U.S. 435, 441, 55 S.Ct. 440, 442, 79 L.Ed. 977.

"Total and permanent disability" is a disability which permanently prevents a claimant from following any substantially gainful occupation. Miller v. U. S., supra. Total disability, it is true, may appear when the performance of the labor seriously aggravates a disability as in diseases like tuberculosis. Likewise, to be a legal excuse for nonpayment of premiums, total and permanent disability must exist before the premiums are due and unpaid.

From all the evidence we are unable to make out a case of total and permanent disability existing when plaintiff defaulted in his premium payments.

The judgment is reversed with directions to proceed in accordance with the views here expressed.