**WATTS et al. v. UNITED STATES.**
No. 50.

District Court, S. D. Mississippi,
Hattiesburg Division.

Oct. 26, 1938.

Ed Currie and Cephus Anderson, both of Hattiesburg, Miss:, and Henry Mounger, of Columbia, Miss., for plaintiffs.

Toxey Hall, U. S. Atty., and A. Y. Harper and S. C. Broom, Asst. U. S. Attys., all of Jackson, Miss, and Daniel Dillon, Atty., Department of Justice, of Oklahoma City, Okl.

MIZE, District Judge.

This suit is based upon a war risk insurance policy, brought by the beneficiary named in the policy, which policy insured Zealous Watts against total and permanent disability. The defendant at the close of all evidence moved for a directed verdict. This

motion was overruled and the jury returned a verdict for the plaintiffs. Thereupon, within ten days after the reception of the verdict, the government moved that the verdict and the judgment entered thereon be set aside and that judgment be entered in accordance with its motion for a directed verdict as provided by Rule 50, subdivision (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

It is admitted that Zealous Watts enlisted in military service on June 1, 1918 and was honorably discharged on February 18, 1919. While he was in service he was granted $10,000 War Risk Term Insurance. It is undisputed that this policy lapsed for non-payment of premium due March 1, 1919, and that the grace period provided in the policy expired on April 1, 1919 unless at that time the insured was totally and permanently disabled. No accurate definition of total and permanent disability can be given, but each case must be governed by the particular facts and circumstances of that case, and upon application for directed verdict all of the undisputed facts favorable to the party against whom the directed verdict is asked and all reasonable inferences deducible therefrom are to be regarded as true. Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492. The facts, therefore, will be stated briefly for the purpose of determining whether the directed verdict should have been given or not.

The testimony is undisputed that the deceased, Zealous Watts, was stricken with influenza in October, 1918, which later developed into double pneumonia and he remained in the hospital until sometime in November, 1919. He was discharged at Camp Shelby, Mississippi and immediately went to his home. The lay witness testified that at that time he was thin, emaciated, weak and had a severe cough; that he was unable to do any work and soon thereafter developed night sweats and commenced to run temperature; that in May, 1919 he had a severe hemorrhage and from that time until the time of his death on July 15, 1929 he was unable to do any work whatever; that he undertook to do some work on one day and followed this for only about two hours, when he had another severe hemorrhage in the field and thereupon undertook to do no more work; that his condition gradually grew worse; that when he had the first hemorrhage the doctor was called and gave directions as to

how he should be treated,—that he should follow a diet consisting largely of eggs, milk, etc., and should rest as much as possible; that these instructions of the doctor were carried out; that he did rest and remained on that diet up until the date of his death; that during all of that time he would have night sweats, his coughing became worse and he was physically weak; that prior to the time he went into the Army he was strong and robust; that he requested hospitalization on January 6, 1921, and there was introduced in evidence a letter from the deceased to the Veterans Administration, which was taken from the government files, in which he requested the government on August 24, 1922 to furnish him hospitalization, as he was unable to work and was suffering as a result of having had influenza and pneumonia while in the service. This hospitalization was denied him by the government for the reason that it did not appear his trouble was service connected. In 1924 he undertook to go into a private hospital in Birmingham that was maintained by a Railway Company there for which company a brother-in-law of the deceased worked. He was unable to go into this hospital for the reason that he was not an employee and he thereupon returned home. The testimony is to the effect that after he returned home he followed out the instructions that his doctor had theretofore given him in that he took rest continuously and followed the prescribed diet. This testimony was undisputed. It was not shown that he ever at any time after his discharge from the Army engaged in any kind of profitable or remunerative work, except that on one occasion he undertook to work in the field and earned fifteen cents. This was the only amount of money he was shown by the entire record to have earned after his discharge.

It was shown by a document introduced by the government, but not over the signature of the deceased, that he had stated on one of his applications for an examination by the government that he was earning $70 per month as an employee of a Railway Company, but no work record of any Railway Company or any other company was introduced to show that he did actually work, nor was any statement over his signature that he had actually worked introduced, other than that in answer to some of the questions he stated he was helping his father on the farm. These statements against interest, however, were overwhelm-

ingly overthrown by the lay testimony that as a matter of fact he did nothing on the farm. The lay testimony of the government did not dispute this testimony other than that on the one occasion he undertook to do some work in the field.

Plaintiffs introduced Dr. J. R. Anderson, who testified that he could not remember the exact date he was called, but that in fact he made only one visit to him in an emergency; that Dr. Tisdale was his regular family physician; that when he arrived the insured was at that time having a hemorrhage from the lungs and was coughing blood and he was positive it was coming from the lungs; that the insured having had flu and pneumonia, it was his opinion that this tuberculosis had at that time gotten down into a vein and caused the hemorrhage; that in his opinion there was a sloughing or a cavity in the lungs; that there was a gradual process of the germs getting in deeper and deeper; that at that time, in his opinion, the insured had active tuberculosis. This doctor further testified that the negro race does not have the resistance to tuberculosis that the white race has and that tuberculosis is almost invariably fatal to a negro; that in the opinion of this doctor when he first saw this insured, he had no chance at all of ever recovering from that condition; that he could not have worked and was not able to get out of bed; that in his opinion this condition had existed for sometime; that it was in the active, advanced stage when he saw him; that he would not concur in the opinion of any other doctor who diagnosed it as incipient at that time for the reason that in the opinion of this doctor his case was advanced; that he prescribed rest and stopped the flow of blood, and that he did not see him again until in his last illness; that the condition of him at that time was that he was suffering with peritonitis and that this peritonitis was due to the tuberculosis.

Dr. Tisdale testified that in November, 1919 the insured was suffering with incipient tuberculosis, but that he had no records of the treatment or of the examinations made by him and was testifying from his memory as refreshed by statements he had made to the Veterans Administration in 1921.

Dr. McKinnon, who was introduced by the government, stated that he had made a complete medical examination on February 21, 1921, but had no independent recollection of the examination; however, having refreshed his memory from the government reports, his diagnosis was that the insured had slight bronchitis and at that time he was in good physical condition, but that on September 26, 1922 his report showed that the insured was then going into the quiescent stage. On cross examination he testified that the insured was a colored man and that, of course, he had no independent recollection of his condition; he naturally had elicited the history of the case prior to his examination which would give him a lead to the examination of his chest, but that it is not likely that he would have put down all of his history on the report. However, it is shown on the report that the insured was suffering pains in the breast. He testified that upon examination of the insured he heard these sounds in the chest and that is the reason he diagnosed it as bronchitis; that a patient who has developed a continuous cough is likely to have an advanced case of tuberculosis,—rather far advanced; that there is no hemorrhage from tuberculosis of the lung until there has been a breaking down causing a cavity; that when this stage is reached it is likely that he has a far advanced case of tuberculosis; that in his opinion and best judgment a man who had a hemorrhage would be pretty far advanced with tuberculosis; that if a man had a hemorrhage caused by tuberculosis in May, 1919, it would be his best judgment that he had active tuberculosis and had had it for a sufficient length of time for it to have obtained a very definite hold upon him; that a patient who has developed night sweats from tuberculosis in his opinion has had the disease for some time, and that night sweats is one of the late symptoms of tuberculosis.

The government also introduced insured's application for vocational training dated January 15, 1921, in which he had made the statement that he could farm again in the spring, and in answer to a question stated that Bert Watts, his father, was his employer on the farm, and that he was not confined to his bed. In April, 1924 he requested information as to the method of obtaining re-instatement of his lapsed policy. He made the statement in October, 1922, in response to a question as to when his disability began, that it was about a month or two after his discharge and gave his symptoms as a cough and tight chest, tuberculosis in primitive stage and that he was given lung medicine. A medical examination report dated September 26, 1922

showed the examination of sputum was negative, but hospital care was advised. Diagnosis was that he was going into the quiescent stage. Medical examination report dated May 5, 1925 showed a diagnosis of pulmonary tuberculosis, chronic, temp. 100%, active, moderately advanced. The doctor making the examination, however, answered that hospitalization was not needed.

These, in brief, are the issues made by the testimony. It is a well settled principle of law that if reasonable men would draw different conclusions from a given statement of facts, then the question is one for the jury. It is a very difficult matter to determine when a case should be submitted to a jury or when it should be withdrawn from a jury in these border line cases. The courts have written innumerable opinions, but no decision can lay down an accurate rule that will govern every case. A great raft of cases have been cited to the court by both parties to this lawsuit and from these decisions it is easy to announce the conclusion that an insured suffering from incipient tuberculosis when his policy lapsed is not entitled to recover. Incipient tuberculosis is judicially known to be curable and if an insured is only suffering with incipient tuberculosis he must continue to pay his premiums until his total disability develops to that stage where it can be said with reasonable certainty that it will be permanent. United States v. Brewer, 5 Cir., 97 F.2d 899, and the authorities therein cited. Likewise it is well settled that it is not sufficient to prove that tuberculosis eventually was not cured or that the insured died from it. It must be shown that it was fairly evident before the lapse of the policy that he would be permanently totally disabled,—Brewer Case, supra; United States v. Crew, 5 Cir., 84 F. 2d 869; United States v. Atkison, 5 Cir., 84 F.2d 968, and the various authorities cited therein.

It is needless to cite authorities to the effect that long delay in making claim causes a factual presumption against the merit of the claim and puts a heavier burden upon the claimant to show a clear case. This announcement is made in the Brewer Case, supra and is supported by a large number of other cases. It is equally well settled that one who declines or fails to take hospitalization when offered him is not entitled to recover. He must first take advantage of treatment offered and ascertain that this fails, otherwise he will not be entitled to recover. It will be noted, however, from practically all of the authorities which I have hereinbefore referred to, as well as practically all of those which have been cited to me, that the insured either had a work record showing that he was not totally disabled or that he had declined hospitalization when offered him, or else the testimony was insufficient to show a total and permanent disability. A long delay in bringing a suit or filing a claim is not conclusive against plaintiff, but is only strong evidence against him. Lumbra Case, supra. The testimony of lay witnesses is not competent upon matters of opinion, nor as weighty as the judgment of medical witnesses, but lay witnesses are permitted to testify to actual facts within their knowledge, and when these facts, together with the opinion in medical testimony, show a case of total and permanent disability, the plaintiff is entitled to recover. United States v. Monger, 10 Cir., 70 F.2d 361.

The testimony of all of the witnesses, with all of the reasonable inferences therefrom, has a reasonable tendency to show that the insured was totally and permanently disabled prior to the lapse of his policy. There is lacking in this record the elements that are usually found in the authorities when recovery has been denied. The insured in the present case did not do a full day's work at any time after his discharge from the Army while his policy was in force; he immediately sought private medical aid upon the discovery of his failing health; he tried to work, but fell out with a hemorrhage; he applied to the government for hospitalization, which was denied him; he followed the advice and instructions of his physician in treating him and adhered to the prescribed diet. The testimony to this effect is practically undisputed. The testimony is sufficient to justify a jury in reaching the conclusion that his tuberculosis was far advanced at the time of the lapse of his policy rather than in its incipient stage. He ultimately died from the ravages of this disease, and while this is not conclusive testimony that it was permanent at the time of the lapse of his policy, yet it is competent evidence to be weighed along with all of the other facts and circumstances.

A case is properly submitted to the jury whenever the evidence and reasonable inferences therefrom taken most strongly

against the party asking the directed verdict tends to show that the insured had become totally and permanently disabled prior to the date of the lapse of his policy. Lumbra Case, supra; Edwards v. U. S., 4 Cir., 53 F.2d 622; United States v. Johnson, 5 Cir., 74 F.2d 29.

The conclusion is inescapable from the foregoing authorities and statement of facts in this case that the case was properly submitted to the jury. The jury having returned a verdict for the plaintiffs, the motion of the government to set it aside and enter judgment for the government, notwithstanding that verdict, will be overruled and denied. Order may be taken accordingly.